Filed 8/19/14

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E055062 |
| v. | (Super.Ct.No. FVA900999) |
| KEANDRE DION WINDFIELD et al., | OPINION |
|     Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed in part and reversed in part, with directions, and as to Johnson only remanded for resentencing.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant KeAndre Windfield.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Harquan Johnson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Harquan Johnson (Johnson) and KeAndre Windfield (Windfield) of first degree murder (Pen. Code, § 187, subd. (a)),[1] during which they personally used and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) and a principal personally discharged a firearm causing death (§ 12022.53, subds. (d) & (e)(1)). The jury further convicted defendants of attempted premeditated and deliberate murder (§§ 664, 187, subd. (a)), during which they personally used and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and a principal used and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)). As to both offenses, the jury found that defendants committed them for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C)). The jury also convicted defendants of assault with a semiautomatic firearm (§ 245, subd. (b)), during which they personally used a firearm (§ 12022.5, subd. (a)) and which they committed for the benefit of a criminal street gang. Both were sentenced to prison for 90 years to life. They appeal, claiming the preliminary hearing testimony of a prosecution witness should not have been admitted into evidence at trial, the evidence was insufficient to support their convictions of attempted murder, and the jury was misinstructed. Defendants also claim that the firearm allegation findings as to the attempted murder must be stricken. We

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

agree in part and direct some to be stricken. Both defendants assert that the abstracts of judgment should be corrected and we agree and direct the trial court to correct Windfield's, and, upon the resentencing of Johnson, to ensure that his abstract and the minutes of the hearing correctly reflect the year the crimes were committed and the award of pretrial custody credit. Each defendant claims that the sentence imposed upon him, without consideration of his individual characteristics, is a violation of the prohibition on cruel and unusual punishment. We disagree as to Windfield and agree as to Johnson. Therefore, we affirm Windfield's judgment except as to corrections we will direct the trial court to make. As to Johnson, we affirm his convictions and remand to the sentencing court for consideration of the factors as set forth in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*).

## FACTS

Johnson and Windfield were members of the Ramona Blocc Hustla gang. Johnson and Windfield were close friends. Johnson was easily influenced by Windfield and Johnson's gang moniker was Little Bam, while Windfield's was Bam.

Months before June 11, 2009, the murder victim's close friend, MM, had taken the murder victim to a Ramona Blocc party at a place in Rialto where people buy and use drugs and hang out, when members of that gang who were cousins of MM beat up and threatened the murder victim with guns and Windfield sucker punched him.

On June 11, 2009, the murder victim was with MM and the attempted murder victim in the same vicinity, which was near an apartment where three females were

3

spending time together. The attempted murder victim had a "friends with benefits" relationship with Windfield's sister at the time. The murder victim was under the influence and he expressed anger at MM for not intervening on his behalf during the prior dust up between him, MM's cousins and Windfield at the party in Rialto. He was also still angry at MM's cousins and Windfield, and he said he wanted to "go over . . . and shoot up Ramona" and "kill those dudes." MM told the murder victim that the latter was drunk, that he was not going to do the things the murder victim said he wanted to do and MM did not want to fight the murder victim over this. The murder victim, still angry at MM, took off his sweater, pulled out a gun and held it down at his side. A van pulled up and parked across the street. Inside were Windfield's sister, the owner of the van and her minor children, Johnson, Windfield and other members of Ramona Blocc. The owner of the van lived with Windfield and his sister. Windfield, then Johnson, got out of the van and approached the murder victim and MM. The murder victim began chasing Johnson and Windfield with his gun pointed, taunting Johnson and Windfield as they ran away from him and accusing them of having jumped him. Windfield's sister got out of the van and was yelling concerning the murder victim intending to shoot people in the presence of the children that were in the van. The murder victim put his gun in Windfield's sister's face. MM and the attempted murder victim told the murder victim that he was tripping and the murder victim eventually put the gun down at his side. The van took off and the murder victim, attempted murder victim and MM stood outside the apartment talking.

4

In the van on the way to Windfield's home, Windfield's sister yelled to Johnson and Windfield that the murder victim had put a gun in her face and has to die for it. Windfield said "we" had to handle the murder victim that night. He angrily said that the murder victim had him running like a little bitch and that made him feel like he was a punk. When they arrived at Windfield's home, Johnson and Windfield armed themselves, borrowed the keys to the van from its owner and left, after Windfield said that they were returning to the scene of the chase.

Meanwhile, back at the scene of the chase, the police arrived in response to a call about a fight, and MM told the murder victim to put his gun away. The murder victim went into the alley behind the apartment complex, while MM stood next to a woman named Nikki, who lived nearby, and the attempted murder victim went inside the apartment where the aforementioned three women were. MM told the police that there had been an argument, but everyone had left. The police then left. The murder victim, the attempted murder victim and MM came together again outside the apartment. MM eventually left after hugging the murder victim, leaving the murder victim and the attempted murder victim outside the apartment, talking. The attempted murder victim told the murder victim that they needed to leave because the police were there (he feared the police would double back and return) but the murder victim did not want to leave. The murder victim said he had to get weed "out of the back" and the attempted murder victim accompanied him towards the alley behind the apartment complex. Nikki was five to six feet away from them and she approached them and said something, but the

5

attempted murder victim did not hear what she said. As the murder victim and the attempted murder victim walked through a corridor in the apartment complex, each was hit by bullets—the attempted murder victim with one and the murder victim with 10 to his front and back, including to his head while the gun was being held to it, several of which shots were fatal. As the attempted murder victim limped away, he saw Nikki crying and saying, "They killed him." He went to a car Windfield's sister had left nearby earlier for him, and drove it to Windfield's home so the sister could drive him to the hospital. When he arrived there, he saw MM.

Between the time he left the murder victim and the attempted murder victim outside the apartment and the attempted murder victim arrived at Windfield's home, MM had driven to a convenience store, purchased a cigar, then had driven to Windfield's home, which Ramona Blocc members frequented, arriving there 15 to 20 minutes after leaving the apartment. MM intended to apologize to Johnson and Windfield for the murder victim's actions in chasing them with a gun and to "resolve the matter." When he arrived at Windfield's, the latter said to him, "Sorry, Cuzo, he had to go" and "I mean he's gone." Windfield said he was sorry but he was not the shooter—Johnson was. When the attempted murder victim subsequently arrived at Windfield's, MM saw that he had been wounded in the leg. Windfield told the attempted murder victim that "they" didn't mean to shoot the attempted murder victim. On the way to the hospital, Windfield's sister asked him if Windfield, then if Johnson, had shot him and he said he did not know. She then said something about the gun going off once and jamming. She

6

said she could not believe that the murder victim had put a gun in her face and he has to die for doing it. When the attempted murder victim arrived at the hospital for treatment, he lied to the doctors and the police about how he had been injured.

More facts will be disclosed as they are pertinent to the issues discussed.

## ISSUES AND DISCUSSION

1. *Admission of Nikki's Preliminary Hearing Testimony*

The trial court permitted the prosecutor to introduce into evidence an audio/video tape of Nikki's preliminary hearing testimony after concluding that she was unavailable as a witness, based on its finding that the prosecution had exercised due diligence in unsuccessfully attempting to locate her and produce her for trial. Defendants here contest the trial court's finding of due diligence. We determine de novo whether due diligence was demonstrated. (*People v. Bunyard* (2009) 45 Cal.4th 836, 851; *People v. Cromer* (2001) 24 Cal.4th 889, 892, 893 (*Cromer*).)

At the June 2011 due diligence hearing, the prosecution offered the testimony of an investigator from the district attorney's office and the case agent. The investigator testified that her office moved Nikki out of state the day Nikki finished her preliminary hearing testimony in October 2009. Nikki had disclosed to the investigator her new address, suggesting that Nikki had chosen it herself, and the investigator had arranged for Nikki to be transported to that address. Three days later, the investigator called and confirmed with Nikki that she had arrived there. However, no one called periodically thereafter to make sure that Nikki was still there. In October 2010, the investigator was

7

asked to track Nikki down. At that time, the investigator ran Nikki through all the available automated systems in California and in the state where Nikki had been relocated, including the Department of Motor Vehicles, CLETS and Accurint. The investigator contacted an investigator for the prosecutor's office where Nikki had relocated and the latter checked all the addresses the former had found and rechecked a couple of them two to three weeks later, in October and November 2010. Nikki had not been living at her last known address for 30 days before contact was made with the manager at the apartment complex where she had lived. The investigator for the local prosecutor's office checked with Nikki's relatives in the area and they had not seen or heard from Nikki for several weeks prior to the contact. The investigator for the local prosecutor's office went to the social service agency that provided money to Nikki while she was living in the place where she had relocated and was informed that she had failed to appear for her last couple of appointments with the agency and to pick up funds it had for her. In November 2010,[2] the investigator called Nikki's friend, Jasmine, who said that she had heard from Nikki three weeks before, but had no way to contact Nikki. Jasmine said that if Nikki contacted her, she would tell Nikki to contact the investigator. The investigator called Jasmine a second time a few weeks later, but Jasmine reported that she had not heard from Nikki and had no contact information for her. Jasmine, again, told the investigator that she would have Nikki call the investigator if Nikki

[2] In his statement of facts, Windfield reports this hearing occurred in November 2011 and, yet, the hearing occurred in June 2011, according to the record.

8

contacted her. The investigator also called the case agent in November 2010,[3] and asked him to contact her if he heard anything on the street about Nikki's whereabouts. In January, April and May 2011, the investigator reran Nikki through the available automated systems in California and the state to which Nikki had relocated.

The case agent testified that he did not try to stay in contact with Nikki after she relocated following the October 2009 preliminary hearing. The prosecutor had asked the case agent to locate Nikki in 2010, possibly in the fall. Starting in September 2010,[4] and

---

[3] See footnote two, *ante*.

[4] Windfield asserts that the case agent gave conflicting testimony about when his search began. We do not, however, share that view. When asked if he could relate the beginning of his search to a particular month, he said it began during the time of the other trial involving Windfield. In response to a question, he then said he began to talk to the people mentioned after footnote four in the text of this opinion in January or February of 2010. The same judge presided over both of Windfield's trials, and the other trial began in April 2011. The trial court then expressed confusion about the case agent's reference to the "other trial" and the agent's testimony that he began speaking to people about Nikki in 2010, by asking, "What trial in 2010?" The following colloquy occurred between the case agent, the trial court and counsel for Johnson,

"[THE CASE AGENT]: [R]ight after the first trial, when [Nikki] was . . . relocated, there started to be some issues with where she was at. And at that time we had started trying to find out where she was because we did not know."
"[THE COURT]: There was no other trial except for the one that we had a few months ago [meaning the April 2011 trial of Canizales and Windfield]. Do you mean some other court proceeding?
"[THE CASE AGENT]: Right . . . after the preliminary [hearing] to the first one.
"[THE COURT]: Okay. So earlier when you spoke about you didn't start until the . . . other trial, you didn't mean the trial we just had a month or two ago [meaning the trial of Canizales and Windfield].
"[THE CASE AGENT]: No. After the preliminary hearing . . . [¶] . . . [¶]
"[COUNSEL FOR JOHNSON]: After the preliminary hearing in [Windfields's] prior trial?
"[CASE AGENT]: Yes."

*[footnote continued on next page]*

9

for more than three months, he spoke to 50 or 60 people in Rialto and surrounding communities who may have known Nikki. Information from these people led the case agent to believe that Nikki might be local, so he notified the agencies in the areas surrounding Rialto and he talked to family members, all of whom denied knowing her whereabouts. Some claimed to have seen Nikki locally within "the last six months or so" before the hearing. Within six or seven months before the hearing, the case agent searched all the places in San Bernardino and Riverside Counties where people said Nikki would reside or frequent on a regular basis. Six months before the hearing, the case agent contacted one of Nikki's aunts, who lived in San Bernardino, but got no information. On and off since January 2011, the case agent had checked the Web site, Accurint, and Nikki's name came up at several locations linked to family members. The

---

*[footnote continued from previous page]*

The preliminary hearing in Windfield's other trial occurred in September 2010. In her argument to the trial court, the prosecutor said, "As soon as we found out that she moved, . . . things are not good with [her], then all efforts were made to find her after that. [¶] . . . [¶] . . . Up until then, we had no reason to believe that [she] . . . was an ureliable witness." In its ruling, the trial court found that the case agent "start[ed] looking . . . he said trial, but he meant prelim—back then . . . ." We doubt that the trial court was making a finding that the case agent did not begin his search until April 2011. As Windfield, himself, points out, we defer to the trial court's determination of historical facts.

Windfield also misreads the record by asserting that the case agent testified that he started looking for Nikki "about three months before he visited [her] aunt" citing page 890 of the reporter's transcript. On that page, the agent testified that he spent at least three months talking to local people, and this three-month period preceded his talk with the aunt, which occurred two weeks before the hearing.

Citing reporter's transcript page 894, Windfield asserts that the case agent testified that he had been looking for Nikki for six or seven months before he visited the aunt. No such testimony appears on that page.

10

case agent and another detective went to those locations and staked them out several times to see if they could determine Nikki's whereabouts. From three months before the hearing, the case agent tried just about every day to contact Nikki by telephone and by contacting law enforcement agencies. Approximately two months before the hearing, he put Nikki's information into the C.I.I. database, with a flyer, so that if she were stopped by the police, the officer who stopped her would have the information that Rialto Police Department should be contacted. The flyer was still active at the time of the hearing. Within the last two weeks before the hearing, the case agent visited another of Nikki's aunts and he contacted several other family members who lived locally. The aunt dialed a phone number for Nikki's mother and sister in another state and the case agent spoke to them in the presence of the aunt, but they reported that they had not been in contact with Nikki for some time. Other information[5] led to an apartment complex in the city in Colorado[6] where Nikki's mother and sister lived. Two weeks before the hearing, the case agent contacted the police in that city and they went to the complex and discovered that Nikki had moved out of the complex within the last month. The case agent tracked Nikki

---

[5] Windfield misreads the record by asserting that the case agent testified first that he obtained information about the apartment complex from talking on the phone to Nikki's mother and sister, then testified that his contact with them was not fruitful. Actually, the detective testified that "*after* speaking with [the] sister and mother, . . . [he] manage[d] to locate . . . further information on [Nikki's] whereabouts" which led him to the apartment complex. He never testified that speaking with the mother and sister on the phone *led to* his discovery of the apartment complex.

[6] Although during its remarks while ruling on the motion the trial court said that it had struck the reference to Colorado, the record does not support this.

to a second other state, because she had been a passenger in a car that had been stopped by law enforcement. Two weeks before the hearing, the case agent had local law enforcement go the address of the registered owner of the car, but the owner claimed not to know Nikki. The trial court ultimately found the case agent's testimony to be credible.

The prosecutor represented to the trial court at the hearing that when the district attorney's office relocated Nikki in 2009, the district attorney's office believed they were on good terms with her and she had no criminal convictions then or at the time of trial. Because Nikki was in a place where she was surrounded by family members, the prosecutor believed her office would be able to contact Nikki. The prosecutor also said that it was her understanding that while the district attorney's office gave Nikki money so she could relocate, the office did not pay her rent once she did so. Trial counsel for Johnson represented that Nikki was unemployed and was on public assistance.

The defendants correctly point out that due diligence "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' [Citations.] Relevant considerations include '"whether the search was timely began'" [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation]." (*Cromer*, *supra*, 24 Cal. 4th at p. 904.)

By misconstruing the case agent's testimony, a matter which we have already addressed,[7] defendants assert that the case agent was aware that Nikki had gone missing

---

[7] See footnote four, *ante*, pages 10-11.

as soon as she was relocated in October 2009. In fact, the agent testified that she had gone missing at the time of the preliminary hearing in the other case involving Windfield, which occurred in September 2010[8] and that was when he began his search for her. Therefore, the record does not support defendant's assertion that the search was not begun in a timely fashion. Although it was a month later that the district attorney's investigator began searching for Nikki, the case agent had already begun his search.

Next, the defendants criticize the case agent for searching for Nikki locally when he knew she had been relocated to another state. However, the agent testified that information he gathered led him to believe that Nikki was local and people had told him that they had seen her in the area within six months before the hearing. This was entirely consistent with the agent's testimony that after the preliminary hearing in Windfield's other case in September 2010, law enforcement became concerned that Nikki had disappeared from where she had been relocated. We surmise that if the case agent, upon receipt of such information, had failed to search for her locally, defendants would have criticized him for that.

The defendants also assert that the prosecution is responsible for Nikki's absence at the time of trial "because relocating her to another state was surely a primary cause" of that absence. This is pure speculation. Additionally, defendants cite no authority holding that when the prosecution relocates a witness, it assumes the burden of keeping track of that witness. In fact, absent knowledge of a substantial risk that an important witness will

---

[8] See footnote four, *ante*, pages 9-10.

13

flee, the prosecution has no obligation to take preventative measures to stop that witness from fleeing. (*People v. Wilson* (2005) 36 Cal.4th 309, 342.) Defendants contend that the prosecution could have obtained a hold and/or bond pursuant to section 1332 before relocating Nikki. However, that section, itself, requires that the court be satisfied by proof on oath that there is good cause to believe that the material witness will not appear and testify unless security is required, and there is no evidence that the prosecution had any reason in October 2009 to believe that Nikki would not be available for trial in 2011. Defendants also criticize the prosecution for not contacting hospitals and medical establishments at the place where she was relocated, but we find that checking with the welfare agency that was providing her money was just as good, if not better, than this. Moreover, given the current status of HIPAA (Health Insurance Portability and Accuracy Act of 1996), we doubt that it would have been easy for law enforcement to obtain information about Nikki from medical providers. As to defendants' suggestion that clinics and hospitals should have been contacted to determine if the child she was carrying at the time of the crimes received treatment at any of those facilities, it is clear that defendants failed to read that portion of the record in which trial counsel for Johnson informed the court that that child had been taken from Nikki by the local Department of Children and Family Services and given to the child's father.

One of the women in the aforementioned apartment testified at trial that Nikki had identified Johnson and Windfield as the shooters to her and this woman had told the case agent the same thing in December 2009. This woman also testified that Nikki had asked

14

her and the other women in the apartment to lie to the police and say that Nikki was inside during the shooting. Another woman at the apartment told the case agent that Nikki didn't want to be implicated in the shooting, so this woman lied to the first detective and told him that Nikki was in the apartment at the time of the shooting. A third woman in the apartment testified that she could have told the case agent that Nikki had identified Johnson and Windfield as the gunmen. The case agent testified that this woman told him that Nikki had, indeed, identified Johnson and Windfield as the gunmen and a copy of the recording of this interview was played for the jury. The jury was instructed that Nikki's statements to others were not admitted for the truth of the matters asserted therein, but if the jury believed that she made them, the jury was to use them to determine if her preliminary hearing testimony was believable.

MM provided the motive for Johnson and Windfield to retaliate against the murder victim by testifying that the murder victim had chased them with a gun prior to the shooting and had put his gun in Windfield's sister's face. Although MM did not tell the first detective who interviewed him this (and he testified to reasons for this), he told the case agent that after the shooting, Windfield had said that the murder victim "had to go" and that Johnson had shot him. Similarly, MM testified that Windfield told him that the murder victim "had to go" and Johnson was the shooter. He also testified that Windfield had told the attempted murder victim that "they" didn't mean to shoot him.

The attempted murder victim also testified, and had previously told the case agent, that the murder victim had chased Johnson and Windfield with a gun and put it in

15

Windfield's sister's face before the shootings. He told the case agent that Windfield's sister had asked him if Windfield and Johnson had shot him, but he told her he did not know. He also told the case agent that Windfield's sister was very upset that the murder victim had put his gun in her face and he had to die for it. He also told the agent that he was hurt that Windfield's sister had taken Windfield to the place where the sister insinuated that Windfield had shot him and the murder victim, although he denied actually seeing them do it. He told the agent that Windfield's sister was a proud Ramona Blocc "wanna be" and could be more dangerous than an actual gang member.

The owner of the van testified that Johnson wore a jacket with the cartoon character, Sylvester the cat, on it during the chase and before and after the shooting. She testified that the murder victim chased Johnson and Windfield with a gun and put it in Windfield's sister's face. She also testified that Windfield's sister said, in the presence of Johnson and Windfield, that the murder victim had to be killed, and Windfield said that they had to handle the murder victim that night—that the murder victim had Windfield "running like a little bitch," which made Windfield feel like a punk. The van owner testified that she saw Johnson and Windfield retrieve guns from near Windfield's home. She testified that Windfield said he and Johnson were going to return to the scene of the chase. They got the keys to the van from the owner, got into the van with their guns and took off. They returned 20 to 30 minutes later and Johnson asked the van owner if she would take him to the hood of the rival gang, Hustla Squad, where he could drop off the clothes he had in his hand, so it would seem like that gang killed the murder victim. She

16

testified that Johnson told her that at the scene of the shooting, he had hopped a wall to get to the murder victim, Nikki had seen him and asked him if she wanted him to tell the attempted murder victim to get away from the murder victim, but he just looked at her, and that Johnson and Windfield ran around to where the murder victim was and started shooting him. Windfield told the van owner that he used all his bullets on the murder victim and had shot him more than four times. Johnson showed her how, after the murder victim fell to the ground, he walked over to the murder victim and shot him in the face and chest, using two hands. Windfield said they had shot the murder victim because the latter had Windfield running like Windfield was a bitch. Windfield said more than four times that he shot the murder victim. Windfield asked Johnson if Johnson had shot the murder victim in the face and Johnson said that he had. Johnson told the van owner not to tell on him—that she was his "big sister." With Johnson standing next to him, Windfield told the attempted murder victim that he was sorry and he didn't mean to shoot the latter. Windfield told the van driver that the murder victim had to die and he was running Windfield "like a bitch." She accused Johnson's mother of trying to bribe her not to testify and of telling her to tell Nikki not to testify or she would have someone kill Nikki for money.

Nikki's preliminary hearing testimony corroborated the story about the murder victim chasing Johnson and Windfield with the gun. She identified Johnson and Windfield as the shooters. She testified that Johnson wore a jacket with Sylvester the cat on it. She said that the final shot to the murder victim was delivered as the end of the gun

17

rested against his head. She admitted telling the first detective who interviewed her five or six different stories. She testified that she did not begin making identifications of the shooters until the first detective who interviewed her threatened to arrest her for child endangerment for getting drunk two weekends before and for obstructing or delaying a peace officer. She also admitted being offered relocation and money by the prosecutor's office in exchange for her help with the investigation.

The detective who first interviewed Nikki testified for Johnson that Nikki told him a number of stories about the shooting. He also testified that Nikki identified Johnson and Windfield as the shooters during the same interview during which she was offered relocation and she repeated her identification of them during subsequent interviews. She also said that the attempted murder victim went into the murder victim's pockets after the latter had been killed. Although 37 cents was found next to the murder victim's body, his pockets had not been turned out.

The case agent testified for Johnson that Nikki had told the first detective everything she testified to at the preliminary hearing and more.

The pathologist who performed the autopsy testified that the bullet wound to the murder victim's head was a contact—or near contact—wound and could have been delivered while the victim was lying on the ground and the barrel of the gun was placed against his head.

The prosecution's gang expert testified that Johnson and Windfield were members of Ramona Blocc Hustlas, whose primary rival was the Hustla Squad Clicc. The expert

18

opined that the shootings benefitted Ramona Blocc because they were in retaliation for the murder victim disrespecting Windfield, who was one of the main heads and most active member of Ramona Blocc, by chasing him around with a gun. Graffiti near the crime scene referenced the killing of the murder victim and disrespect to Ramona Blocc.

While no one could dispute that Nikki was an *important* witness, she was not a *crucial* witness, as the foregoing makes clear, and important portions of her testimony were corroborated by other witnesses. There was plenty of evidence aside from her testimony supporting the convictions and she was impeached with the conflicting stories she told, with her effort to get the women in the apartment to lie for her and with the facts that she was compensated and that the prosecutor ultimately discounted her story that it was Windfield, and not Johnson, who fired the shots into the murder victim's body. In fact, trial counsel *for Johnson* played portions of Nikki's preliminary hearing testimony during his argument to the jury, pointing out how her testimony demonstrated her lack of credibility or conflicted with other evidence presented at trial. Thus, defendants' assertion that an *extraordinary* showing of due diligence was in order because of her value to the prosecution (see *People v. Herrera* (2010) 49 Cal.4th 613, 622) must be rejected.

2. *Insufficiency of the Evidence*

Defendants contend that there was insufficient evidence to support a finding by the jury that they created a kill zone by firing their guns and the attempted murder victim was in that zone. During argument to the jury, the prosecutor stated that her theory of

19

defendants' guilt for the attempted murder of the attempted murder victim was kill zone. In connection with this theory, the jury was instructed, "A person may intend to kill a specific victim and/or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of the [attempted murder victim], the People must prove that defendant not only intended to kill [the murder victim] but also either intended to kill [the attempted murder victim], or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill [the attempted murder victim] or intended to kill [the murder victim] by killing everyone in the kill zone, then you must find the defendant not guilty of attempted murder of [the attempted murder victim]."

In *People v. Bland* (2002) 28 Cal.4th 313, 328, 329, 330, 333 (*Bland*), the California Supreme Court explained the kill zone theory as follows:  " . . . [A defendant] who shoots at a group of people [can be] punished for the actions towards *everyone in the group* even if [the defendant] primarily targeted only one of them . . . .  [A defendant] might . . . be guilty of attempted murder of *everyone in the group* . . . .  [¶]  . . . [T]he fact [that a defendant] desires to kill a particular target does not preclude finding that the [defendant] also, concurrently, intended to kill others within what it termed the 'kill zone.'  'The intent is concurrent . . . *when the nature and scope of the attack*, while directed at a primary victim, *are such that we can conclude* [*that the defendant*] *intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . .* When the defendant escalate[s] his mode of attack from a single bullet aimed at A's head

20

to a hail of bullets . . . , the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around the victim, the factfinder can *reasonably infer that the defendant intended that harm to all who are in the anticipated zone . . . .*' [Citation.]" (*Id*. at pp. 328-330.)**9**

In *People v. Stone* (2009) 46 Cal.4th 131 (*Stone*), the high court said of *Bland*, "The evidence supported a jury finding that the defendant intended to kill the driver [of the car into which he shot] but *did not specifically target* the two who survived. [Citation.] . . . We summarized the rule that applies when an intended target is killed and *unintended* targets are injured but not killed. . . . [¶] . . . [I]f a person targets one particular person, . . . a jury could find the person *also*, concurrently, intended to kill— and thus was guilty of the attempted murder of—other, *nontargeted* persons." (*Stone*, at pp. 136-137, some italics original, some added.) In her dissent in *Smith*, *supra*, 37 Cal.4th at pages 755 and 756, Justice Werdegar said, "A kill zone . . . analysis . . . focuses on (1) whether the fact finder can rationally *infer from the type and extent of force*

---

**9** Defendants incorrectly cite *People v. Smith* (2005) 37 Cal.4th 733 (*Smith*) as a kill zone case. It was not. Kill zone instructions were not given in *Smith* and the California Supreme Court stated, "We thus have no occasion here to decide under what factual circumstances, if any, the firing of a single bullet might give rise to multiple convictions of attempted murder under *Bland*'s kill zone rationale." (*Id*. at p. 746, fn. 3.) Therein, the court held that there was sufficient evidence that the defendant, who fired a single bullet into a car through the rear window at his former girlfriend, knowing that her baby was in his line of fire, from a distance of one car length, intended to kill the child, even though no evidence was presented that he bore any ill will towards the child. (*Id*. at pp. 736, 742-743, 746-747.)

21

*employed* in the defendant's attack on the primary target *that the defendant intentionally created a zone of fatal harm*, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm." (Italics added.)

In *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023 (*Adams*), the Fifth District said, "[T]he . . . [theory] permits a rational jury *to infer the required express malice* from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm. . . . [It] recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person . . . . [It] imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person . . . despite the recognition, or with the acceptance of the fact, that *a natural and probable consequence of that act would be that anyone within that zone could or would die*." In *People v. Campos* (2007) 156 Cal.App.4th 1228, 1243, the appellate court held, "[The kill zone theory] . . . is simply a reasonable inference the jury may draw in a given case . . . ."

Kill zone victims can include those not seen by the defendant or of which the defendant is unaware. (*Adams*, *supra*, 169 Cal.App.4th at p. 1023; *People v. Vang* (2001) 87 Cal.App.4th 554, 564 (*Vang*), cited with approval in *Bland*, *supra*, 28 Cal.4th at p. 330.)

Defendants assert that there is insufficient evidence to support a kill zone theory because "[Johnson] and . . . Windfield waited for [the murder victim] to appear, and

22

when he did appear they fired at close range a number of well-targeted shots designed to hit and kill only [the murder victim]." That's *defendants'* interpretation of the evidence—one which does not support the verdict. In examining a record for sufficiency of the evidence, we do not do this if a reasonable jury could have had another interpretation—one that supported a kill zone theory (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Lindberg* (2008) 45 Cal.4th 1, 27), and that is the case here. Moreover, there was no evidence that Johnson and Windfield waited specifically for the murder victim. Even if they did, that fact would not detract from the determination whether "the nature and scope of the attack" was such that the jury could reasonably conclude that they intended to ensure harm to the murder victim by harming everyone in his vicinity. (See *Bland*, *supra*, 28 Cal.4th at pp. 313, 329.) We also disagree with defendants' categorization of the shots as "well-targeted, designed to hit and kill only [the murder victim]" under the circumstances here. The attempted murder victim testified that just before the shots began, he and the murder victim were walking side by side, then he heard the first shot or shots, he told the murder victim to hold up, then both turned and ran into each other, and while turned, facing each other, and probably as he was turning, he got shot. Based on this, and his testimony that when he went down after being shot, he thought the murder victim was still standing and the latter fell on top of him, it is most likely that he got hit before the murder victim did, while he and the murder victim were very close to each other. He testified that when the shooting began, the muzzle flashes were 15 feet from him, but as the shooting progressed the shooters got within six to eight

23

feet of him. In her preliminary hearing testimony, Nikki said that when Johnson and Windfield approached the murder victim, the attempted murder victim was holding him tightly by having one of his arms over the murder victim's shoulder[10] and after that, while Johnson and Windfield were shooting at the murder victim, the attempted murder victim was trying to cover or shield the murder victim, by standing between him and the defendants, and he moved his body as they moved, so they couldn't shoot the murder victim. However, "well-targeted" the defendants' bullets might have been, when another person is standing very close to the targeted victim or has placed himself between the shooters and the targeted victim and is acting as a shield for the latter, we cannot imagine a more appropriate application of the kill zone theory where, despite this, the shooters shoot, actually hitting that person. Contrary to defendants' assertion, the fact that the murder victim was hit with nine bullets (aside from the "coup de gras" to the head) and the attempted murder victim with only one does not disprove that the attempted murder victim was in the line of fire. It is obvious that the attempted murder victim was either hit before the murder victim, or collapsed to the ground before the murder victim did. Moreover, defendants' attack on Nikki's testimony that clearly established that the attempted murder victim was in the line of fire because, according to them, she "never gave a reliable description of precisely where the shooters were positioned when [the murder victim] was shot" is specious. She described, with great precision, where the

---

[10] She said he was trying to stop the murder victim from going any closer to where Nikki had warned him the armed defendants were.

24

attempted murder victim was in relation to the murder victim and the attempted murder victim's testimony corroborated at least part of this description (i.e., he testified that he told the murder victim to hold up as the first shot or shots were fired and this was consistent with Nikki's description that he was holding back the murder victim, and he testified that the two ran into each other as he was hit with the bullet, which was not inconsistent with her perception that he was shielding the murder victim during the shooting).  Moreover, on a sufficiency of the evidence claim, we do not discount a witness's testimony unless it is so improbable as to be unworthy of belief (*People v. Thornton* (1974) 11 Cal.3d 738, 784, overruled on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 685, fn. 12), and Nikki's was not.

Defendants' assertion that the method used—a hail of bullets from two different guns—was insufficient is absurd.  Perhaps if the victims had been inside a house and defendants had used small caliber bullets, they would have an arguable position—but defendants were mere feet from two unarmed people who were very close to each other, if not on top of each other.  Under these circumstances, the jury could reasonably infer that defendants "'used a means to kill the [murder victim] that inevitably would result in the death of other victims within the zone of danger.'"  (*Stone, supra*, 46 Cal.4th at p. 138.)

As to the fact that Windfield apologized to the attempted murder victim, saying they did not intend to shoot him, and therefore the jury could not infer the intent to kill, the jury was perfectly free to reject this self-serving statement.  If, as defendants assert,

25

they were "being careful not to shoot" the attempted murder victim, they did a lousy job, taking him down before the murder victim. Moreover, we doubt that the defendants in *Vang* had any particular desire to kill the daughter of their intended target or to injure his wife, or to do either to his other two children who were not injured, but, nonetheless were attempted murder victims when the defendants unleashed a hail of bullets at their house due to gang rivalry. (*Vang, supra*, 87 Cal.App.4th at p. 558.) The same is true of the wounded mother and uninjured siblings of another intended victim at their apartment. (*Ibid*.) In response to the defendants' claim that there was insufficient evidence that they intended to kill anyone except the two targets, the Court of Appeal held, "Defendants' argument might have more force if only a single shot had been fired in the direction of where [the two intended targets] could be seen." (*Id.* at p. 564.) In *Bland*, the California Supreme Court approved the language in *Vang* that the fact that the defendants did not see some of their victims "'who were present and in harm's way'" somehow negated the intent to kill them. (*Bland*, *supra*, 28 Cal.4th at p. 330.) In *Adams*, the appellate court similarly upheld convictions of attempted murder against victims who were not seen by the defendant, but who were placed in danger of death by his actions. The court reasoned, "[t]he theory imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person or persons despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within that zone could or would die." (*Adams*, *supra*, 169 Cal.App.4th at p. 1023.) As stated before, the

kill zone theory permits a jury to reasonably infer the intent to kill based on the nature and scope of the attack. The defendant's particular feelings towards the nontarget attempted murder victim—whether good, bad, indifferent or nonexistent, has nothing to do with it, if the defendant created the kill zone and the attempted murder victim was in it. This case involved not only *Bland*'s "hail of bullets," but at very close range.

Although defendants did not mention *People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*) until Windfield's reply brief, when the People had no opportunity to address it, we shall do so anyway. *McCloud* begins its discussion of the kill zone theory by citing language in *Smith, supra,* 37 Cal.4th at page 733, about that theory. *Smith*, however, is not a kill zone case, so anything said about the theory therein is dicta. (Accord, *Adams, supra,* 169 Cal.App.4th at pp. 1009, 1022.) Moreover, *Smith* interpreted the reasoning in *Bland*, which we have extensively quoted above, to mean that "a shooter may be convicted of multiple counts of attempted murder on the 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim . . . as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm."[11] (*Smith*, at pp. 745-746.) At the same time, the *Smith* court quoted *Bland*'s language that, "'[The kill zone

---

[11] As already stated *Vang* and *Adams* have held that it is not necessary for the defendant to be aware of the presence of the actual murder victim.

27

theory] is simply *a reasonable inference the jury may draw* in a given case:  a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' [Citation.]"  (*Smith*, at p. 746.)

Based on this language, and with no further citation to any precedent, *McCloud* states, "The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury.  Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual.  Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located*.  The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area.  In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located.  [¶] . . . [T]he defendant *specifically intends* that *everyone* in the kill zone die.  If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of attempted murder." (*McCloud*, *supra*, 211 Cal.App.4th at p. 798.)

28

In our view, *McCloud* goes too far. The language in *Bland*, cited above, posits that the intent to kill the nontargeted person(s) *can be inferred* from the nature and scope of the attack or from the method employed. If, as *McCloud* asserts, the defendant must in fact intend to kill each attempted murder victim, there is no reason to employ the theory—the intent to kill is established without resort to the theory. That *McCloud* overstates the theory is proven by language in other California Supreme Court opinions. As we have already stated, in *Stone, supra,* 46 Cal.4th at pages 131, 136, and 137, the high court said of *Bland*, "The evidence supported a jury finding that the defendant intended to kill the driver [of the car into which he shot] but *did not specifically target* the two who survived. [Citation.] . . . We summarized the rule that applies when an intended target is killed and *unintended* targets are injured but not killed. . . . [¶] . . . [I]f a person targets one particular person, . . . a jury could find the person *also*, concurrently, intended to kill—and thus was guilty of the attempted murder of—other, *nontargeted* persons." (Some italics original, some added.) As we have already stated, in her dissent in *Smith*, *supra*, 37 Cal.4th at pages 755 and 756, Justice Werdegar said, "A kill zone . . . analysis . . . focuses on (1) whether the fact finder can rationally *infer from the type and extent of force employed* in the defendant's attack on the primary target *that the defendant intentionally created a zone of fatal harm*, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm." (Italics added.)

Language in opinions of the Court of Appeal also suggest that *McCloud* misstates the kill zone theory. As already stated, in *Adams*, *supra*, 169 Cal.App.4th at page 1023,

29

the Fifth District said, "[T]he . . . [theory] permits a rational jury *to infer the required express malice* from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm. [It] recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person . . . . [It] imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person . . . despite the recognition, or with the acceptance of the fact, that . . . *a natural and probable consequence of that act would be that anyone within the zone could or would die.*" In *People v. Campo, supra,* 156 Cal.App.4th at page 1243, the appellate court held, "The [kill zone] theory . . . is simply a reasonable inference the jury may draw in a given case . . . ."

Moreover, *McCloud*'s restrictive view of the kill zone theory cannot possibly be reconciled with the holding of two different appellate courts, and the approval by the California Supreme Court of one of those holdings, that kill zone victims can include those not seen by the defendant or of which the defendant is unaware. (See text at p. 24.)

3. *Jury Instruction Error*

a. *Provocation as to the Attempted Murder*

In connection with the charged murder, the jury was instructed, in accordance with CALCRIM No. 522, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the

30

provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The jury was also given the standard instruction on the heat of passion/provocation theory of voluntary manslaughter, which imposes an objective standard on the reasonableness of the provocation, while CALCRIM No. 522 does not.[12]

As to the charged attempted murder, the jury was instructed on the requirements of the finding that it was premeditated and deliberate. The jury was also instructed on attempted heat of passion/provocation voluntary manslaughter, which imposes an objective standard on the reasonableness of defendant's reaction to the provocation.

Defendants here claim that the trial court's failure, sua sponte, to give an instruction as to the charged attempted murder similar to CALCRIM No. 522 requires reversal of the findings that it was premeditated and deliberate. At the same time, they recognize that two California Supreme Court decisions have held that there is no sua sponte duty to give CALCRIM No. 522. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-880; *People v. Middleton* (1997) 52 Cal.App.4th 19, 31-33, [disapproved on other grounds in *People v. Gonzales* (2003) 31 Cal.4th 745, 752.) Of course, we are bound by

_____

[12] See *People v. Valentine* (1946) 28 Cal.2d 121, 132, *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295, 1296 and *People v. Padilla* (2002) 103 Cal.App.4th 675, 678.

31

Supreme Court decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

As a fall-back, defendants claim that their trial counsels' failure to request a CALCRIM No. 522-like instruction as to the charged attempted murder constitutes incompetency of counsel. In order to prevail, they must demonstrate a reasonable probability that, but for the failure to request this instruction, the outcome of this trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-694, 697-698.) That probability must be sufficient to undermine confidence in the verdicts. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) However, defendants cannot carry their burden. In convicting them of first degree murder, the jury necessarily rejected the possibility that any provocation that existed reduced the first degree murder to second degree murder. This is true for either theory of first degree murder that was available to the jurors, whether premeditated and deliberate or lying in wait, as the latter, the jury was instructed, required "a state of mind equivalent to deliberation or premeditation." Because the murder and the attempted murder were committed simultaneously, by the same acts and under the same circumstances and were interconnected by the use of the kill zone theory as to the latter, there was no basis for the jury to conclude that some provocation reduced the attempted murder to nondeliberate, nonpremeditated attempted murder, but did not reduce the murder to second degree murder.

4. *Gun Allegations as to the Attempted Murder*

The first amended information, filed April 1, 2010, was the first charging

document in this case to allege that defendants had attempted to murder the attempted

murder victim. It alleged, in connection with the charged attempted murder, that

defendants had personally and intentionally discharged a firearm which caused great

bodily injury and death to the attempted murder victim within the meaning of section

12022.53, subdivision (d). It also alleged that a principal personally and intentionally

discharged a firearm, proximately causing great bodily injury and death to the attempted

murder victim, pursuant to section 12022.53, subdivisions (d) and (e)(1). Defendants

were arraigned on this charging document while represented by counsel. On June 1,

2011, during voir dire, the trial court read the information to the prospective jurors,

omitting any references to causing death to the attempted murder victim. On June 7,

2011, the seventh day of trial, when voir dire was still occurring, the prosecutor told the

trial court that she would be omitting from the charging document the great bodily injury

to the attempted murder victim allegation, pursuant to section 12022.7 and count 4,[13] and

would be adding the allegation that the attempted murder was willful, premeditated and

deliberate. She said she would be filing an amended information to reflect these changes.

The following day, the prosecutor filed what was entitled the third amended information,

although our review of the record before this court and the superior court record shows

---

[13] It had been the substantive crime of associating with a gang. This count had not been read to the jury.

33

that no second amended information was ever filed. The so-called third amended information alleged, in connection with the charged attempted murder, that Johnson and Windfield "personally and intentionally discharged a firearm . . . , which caused death to [the murder victim] within the meaning of Penal Code section 12022.53[, subdivision] (d) . . . ." It also alleged as to this count that "a principal personally and intentionally discharged a firearm . . . , which proximately caused death to [the murder victim] within the meaning of Penal Code sections 12022.53[, subdivisions] (d) and (e)(1)." It also alleged that the attempted murder had been committed for the benefit of a gang. Finally, it alleged that the victim of this count was the murder victim. The prosecutor's opening statement is not part of the record before this court.

During arguments to the jury, on July 15, 2011, the prosecutor told the trial court that she wanted to make sure, by interlineations, that count 2 in the so-called third amended information "reflect[ed the attempted murder victim]." The trial court said it would make that order. Although no such interlineations appear in the record before this court, we will deem the so-called third amended information to have been amended to substitute the attempted murder victim's name in place of the murder victim's as to this count and the allegations to read that great bodily injury, not death, was caused to the attempted murder victim. Defendants' assertion that the amendment affected only the name of the victim and not the enhancement allegations, exalts form over substance, especially in light of the fact that the parties went to trial with a charging document that for almost 15 months before it was incorrectly amended, set forth enhancement

34

allegations under section 12022.53, subdivisions (d) and (e)(1), specifying that the attempted murder was the subject of these allegations. Under the circumstances, defendants can hardly claim that they were unaware that they were going to trial on these allegations. Additionally, neither defendant objected to the verdict forms, which will be described below.

When the jury returned its verdicts, it found, in connection with the attempted murder, that both defendants had personally used a firearm, personally used and intentionally discharged a firearm, and personally used and intentionally discharged a firearm, proximately causing great bodily injury to the attempted murder victim. The jury also found, in connection with the attempted murder, as to both defendants, that a principal used a firearm, a principal used and intentionally discharged a firearm and a principal used and intentionally discharged a firearm proximately causing great bodily injury to the attempted murder victim.

Section 12022.53, subdivision (d), as is pertinent to this count, provides a 25-year-to-life term for a defendant who personally and intentionally discharges a firearm proximately causing great bodily injury during an attempted murder. Section 12022.53, subdivision (e)(i) applies to the enhancements provided in subdivision (b) (which is a 10-year enhancement when any other principal personally uses a firearm), subdivision (c) (which is a 20-year enhancement when any other principal personally and intentionally discharges a firearm), and subdivision (d), (which is a 25-year-to-life term for any principal when any other principal personally and intentionally discharges a firearm

35

proximately causing great bodily injury) when that person committed the crime for the benefit of a street gang.

In making findings that defendants personally used and another principal personally used a firearm and personally used and intentionally discharged a firearm, the jury was making findings pursuant to section 12022.53, subdivisions (b) and (c). Defendants point out that subdivision (j) of section 12022.53 provides that for the penalties provided in that section to apply, any fact required under subdivision (b), (c) or (d) must be alleged in the accusatory pleading. As to both defendants, the sentencing court imposed a term of 25 years to life, which had to have been pursuant to section 12022.53, subdivision (d). Therefore, the penalty under subdivision (d) did apply because the information alleged the necessary facts, i.e., that defendants personally and intentionally discharged a firearm causing great bodily injury and another principal personally and intentionally discharged a firearm causing great bodily injury where the crime was committed for the benefit of a gang. The jury should not have made findings that defendants and a principal personally used a firearm or personally and intentionally discharged a firearm, but since no penalty was imposed as to those findings, there was no violation of subdivision (j). However, we will direct the trial court to strike from the jury's findings[14] any references to them.

---

[14] These findings are not reflected in the minutes of the court.

36

4. *Sentencing*

a. *Windfield's Sentence as Cruel and Unusual*

Windfield was sentenced in this case to three 25-year-to-life terms, plus a life term with a 15 year minimum which was run concurrently with the time imposed in another case of two 25-year-to-life terms, two 15-year-to-life terms plus 40 years. Windfield contends that this sentence violates *Miller v. Alabama* (2012) 567 U.S.___ [132 S.Ct. 2455] (*Miller*).

Windfield was 18 years old when he committed the crimes in both cases and 21 when he was sentenced for both. He points out that his minimum parole eligibility extends beyond any life expectancy he could possibly have. In *Miller*, the United States Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller*, *supra*, 567 U.S. ___ [132 S.Ct. at p. 2460].) The high court noted, "Because juveniles have diminished culpability and greater prospects for reform, . . . 'they are less deserving of the most severe punishments.' [Citation.] . . . [C]hildren have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] . . . [They] 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] . . . [A] child's character is not as 'well formed' as an adult's; his traits are 'less fixed'

37

and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [Citation.] [¶]

. . . [¶] . . . [T]he distinctive attributes of youth diminish the penological justifications

for imposing the harshest sentences on juvenile offenders, even when they commit

terrible crimes. Because "'[t]he heart of the retribution rationale'" relates to an

offender's blameworthiness, "'the case for retribution is not as strong with a minor as

with an adult.'" [Citations.] Nor can deterrence do the work in this context, because

"'the same characteristics that render juveniles less culpable than adults'"—their

immaturity, recklessness, and impetuosity—make them less likely to consider potential

punishment. [Citations.] Similarly, incapacitation could not support the life-without-

parole sentence . . . . Deciding that a 'juvenile offender forever will be a danger to

society' would require 'mak[ing] a judgment that [he] is incorrigible'—but

"'incorrigibility is inconsistent with youth.'" [Citations.] And for the same reason,

rehabilitation could not justify that sentence. Life without parole 'forswears altogether

the rehabilitative ideal.' [Citation.] It reflects 'an irrevocable judgment about [an

offender's] value and place in society,' at odds with a child's capacity for change.

[Citation.] [¶] . . . [¶] . . . [T]he characteristics of youth, and the way they weaken

rationales for punishment, can render a life-without-parole sentence disproportionate.

[Citation.] . . . '[C]riminal procedure laws that fail to take defendants' youthfulness into

account would be flawed.' [Citation.] . . . [¶] [T]he mandatory penalty schemes at issue

here prevent the sentencer from taking account of these central considerations. By

removing youth from the balance—by subjecting a juvenile to the same life-without-

parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionally punishes a juvenile offender. . . . [¶] . . . Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.' [Citations.]" (*Id*. at pp.___[132 S.Ct. at pp. 2464-2466.] "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself . . . . It neglects the circumstances of the homicide . . . , including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors . . . or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id*. at p.___[132 S.Ct. at p. 2468.] "Our decision . . . mandates only that a sentencer follow a certain process— considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Id*. at p.___ [132 S.Ct. at p. 2471].)

Windfield contends that scientific literature shows that the features of juveniles discussed in *Miller* extend to 18 year olds. However, we are bound by precedent and there is no precedent for us to declare that *Miller* applies to 18 year olds. Our legislature

has determined that 18 is the age at which a person is considered an adult. (*People v. Gamache* (2010) 48 Cal.4th 347, 405.)

In *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 (*Argeta*), the appellate court rejected an identical argument, holding, "while '[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.] Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [that the defendant's] sentence is not cruel and/or unusual under *Graham* [*v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011]], *Miller, supra,* 567 U.S. ___[132 S.Ct. 2455], or [*People v.*] *Caballero* [(2012) 55 Cal.4th 262]." Recently, in *Gutierrez, supra*, 58 Cal.4th at page 1380, the California Supreme Court endorsed the distinction drawn between those under the age of 18 at the time of the crime and those 18 or older.

b. *Johnsons's Sentence as Cruel and Unusual*

Johnson, who was 17 when he committed these crimes, also received a sentence of 90 years to life. As he correctly points out, the California Supreme Court has held that a sentence of 110 years to life is the functional equivalent of a sentence of life without parole (*People v. Caballero* (2012) 55 Cal.4th 262, 295 (*Caballero*)), an appellate court

40

concluded that a sentence of 84 years to life is the same (*People v. Mendez* (2010) 188 Cal.App.4th 47, 63 [cited with approval in *Caballero*] and in *Argeta, supra,* 210 Cal.App.4th at p. 1482), the appellate court concluded that a term of at least 75 years in prison for a defendant who was 15 years old at the time of the crime "likely requires that he be in prison for the rest of his life" and the People therein conceded that a minimum sentence of 100 years was the functional equivalent of a life sentence without parole. Johnson also correctly points out that the sentencing court imposed sentence without individualized consideration of him as a person. There was no sentencing memorandum submitted by counsel for Johnson,[15] the probation report contained scant information about Johnson personally and neither counsel for Johnson nor the sentencing court addressed this topic during sentencing. While we recognize that Johnson did not object below to the imposition of this sentence, certainly, an argument could be made that the failure to invoke *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011] on Johnson's behalf could amount to incompetency of trial counsel.[16]

---

[15] We note that at the hearing on Johnson's motion for a new trial, on the day of sentencing, Johnson's trial counsel explained that he had not served the prosecutor with a copy of his motion until earlier that day because he had just finished his last trial of a "non-stop" series of trials that had consumed the entire previous six months, the prior week and he had been "backed up" and had a "heavy calendar" since then, comprised of preliminary hearings.

[16] To avoid such an argument, we will not rely on the forfeiture rule (*People v. Bradford* (1997) 15 Cal.4th 1229, 1314) and will address Johnson's argument on its merits.

We also note that confronted with the same rule in *Gutierrez, supra*, 58 Cal.4th at pages 1354, 1368, the California Supreme Court noted, "[Although a]t sentencing, Gutierrez did not . . . mention the Eighth Amendment, this is unsurprising because at the

*[footnote continued on next page]*

At the same time, we note that the *mandatory* aspect of Johnson's sentence was 50 years to life—that this trial court exercised its discretion, citing the fact that the crimes involved different victims in order to impose consecutive terms for the murder and attempted murder.

*Miller* held that it is a violation of the Eighth Amendment to impose a *mandatory life without parole* sentence upon a juvenile in a homicide case because such a penalty "precludes consideration of [the juvenile's] chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds [the defendant]—and from which [the defendant] cannot usually extricate [him-or her-]self— no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of [the defendant's] participation in the conduct and the way familiar and peer pressures may have affected [the defendant]. Indeed, it ignores that [the defendant] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth . . . ." a sentence from taking account of an

---

*[footnote continued from previous page]*
time the [United States Supreme Court] had not yet granted review in *Miller* and no court had even held that a *mandatory* sentence of life without parole for juveniles convicted of homicide was unconstitutional. After *Miller* was decided, Gutierrez promptly asserted his Eighth Amendment claim in the Court of Appeal, . . . and he now reasserts that claim in this court. Given these circumstances, and because his Eighth Amendment challenge involves a question of law, we exercise our discretion to consider it here. [Citation.]" We note that, like in *Gutierrez*, *Miller* had not been decided at the time Johnson was sentenced, and Johnson is asserting his Eighth Amendment right in this court. (See also, fn. 15, *ante*.)

42

offender's age and wealth of characteristics and circumstances attendant to it." (*Miller*, *supra*, 567 U.S. at pp.___ [132 S.Ct. at pp. 2467-2468] *Miller* concluded that a sentence of life without the possibility of parole or its functional equivalent was appropriate for "the rare juvenile offender whose crime reflects irreparable corruption." (*Id.* at p.___ [132 S.Ct. at p. 2469].) In *Caballero*, *supra*, 55 Cal.4th at page 268, where a juvenile was sentenced to 110 years to life for *nonhomicide* crimes, the California Supreme Court held that "the state may not deprive [juveniles] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future."

More recently, however, in *Gutierrez*, involving two 17 year old defendants convicted of special circumstances murder in two different cases, the California Supreme Court held that section 190.5(b), which prescribes the sentences for juveniles convicted of special circumstance murder, does not embody a presumption in favor of life without the possibility of parole, as doing so would run afoul of *Miller*. Our high court reasoned, "Under *Miller*, a state may authorize its courts to impose life without parole on a juvenile homicide offender when the penalty is discretionary and when the sentencing court's discretion is properly exercised in accordance with *Miller*. Unlike the sentencing laws at issue in *Miller*, section 190.5(b) is discretionary and does not mandate life without parole for juvenile homicide offenders.[17] California's individualized, discretionary sentencing

---

**17** The court observed that "'the factors stated in section 190.3 are available . . . to grant leniency, as guidelines under section 190.5 Because those factors allow the court to take into account any mitigating circumstances which extenuates the gravity of the crime . . . , by extension the criteria stated under California Rules of Court, rule 423 [(now rule 4.423)] are also available as guidelines for the court's exercise of discretion.'

*[footnote continued on next page]*

43

of juvenile homicide offenders differs in significant ways from the mandatory sentencing scheme at issue in *Miller*. *Nevertheless, in light of Miller's reasoning, a sentence of life without parole under section 190.5(b) would raise serious constitutional concerns if it were imposed pursuant to a statutory presumption in favor of such punishment.* [¶] At the core of *Miller's* rationale is the proposition—articulated in *Roper*, amplified in *Graham*, and further elaborated in *Miller* itself—that constitutionally significant differences between children and adults 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' [Citation.] The high court said in plain terms that because of 'children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' [Citation.] 'That is especially so because of the great difficulty . . . of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." [Citations.]' [Citation.] [¶] Reading section 190.5(b) to establish a presumption in favor of life without parole . . . is in serious tension with the foregoing statements in *Miller*. . . . 'Treating [life without parole] as the default sentence takes the *premise of Miller that such sentences should be rarities* and turns that premise on its head . . . .' [¶] . . . [¶] . . . [A] sentencing court has discretion under

---

*[footnote continued from previous page]*
[Citation.]" (*Gutierrez*, at p. 1370.) The Supreme Court further concluded that "Section 190.5(b) authorizes and indeed requires consideration of the *Miller* factors . . . ." (*Id*. at p. 1387.)

44

*Miller* to decide on an individual basis whether a 16- or 17-year old offender is a "'rare juvenile offender whose crime reflects irreparable corruption.'" [Citation.] . . . [¶] Further, *Miller* made clear that its concerns about juveniles' lessened culpability and greater capacity for reform have force independent of the nature of their crimes. . . . *Miller* said, 'the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes*.' [Citation.] . . . *Graham* [*v. Florida* (2010) 560 U.S. 48] and *Roper* [*v. Simmons* (2005) 543 U.S. 551] likewise indicate that the mitigating features for youth can be dispositively relevant, whether the crime is a nonhomicide offense or a heinous murder punishable by death if committed by an adult. [Citations.] . . . To presume that [a broad and diverse range of first degree murder offenses] committed by 16 and 17 year olds merit a presumptive penalty of life without parole cannot be easily reconciled with *Miller's* principle that 'the distinctive attributes of youth [that] diminish the penological justifications for imposing the harshest sentences on juvenile offenders' are not 'crime-specific.' [Citation.] [¶] . . . *Miller* made clear that its concerns about imposing life without parole have applicability whatever the age or crime of a juvenile offender." (*Gutierrez,* at pp. 1379-1381.) Pointing out that while the sentencing court in each of the two defendants' cases "understood it had a degree of discretion in sentencing the defendant . . . neither court made its sentencing decision with awareness of the full scope of discretion conferred by section 190.5(b) or with the guidance set forth in *Miller* and this opinion for the proper exercise of its discretion" the Supreme Court remanded both

cases for resentencing, as the record did not clearly indicate that the sentencing courts would have imposed the same sentences they did even if they had been aware of the full scope of their discretion. (*Id*. at pp. 1390-1391, italics added.) Although there are obvious differences between the context of the cases in *Gutierrez* and the case here, the language in *Gutierrez*, which we reiterate above, sends a message, which is clear to us, that where the functional equivalent of a life term without parole is imposed on a 17 year old convicted of murder, the sentencing court must consider the *Miller* factors.[18] Unless the record demonstrates that the sentencing court would have arrived at the same sentence had it considered the *Miller* factors, remand is appropriate for such consideration.[19]

---

[18] We are aware that the California Supreme Court has granted review in two cases which address the applicability of new section 3051's provision for a parole hearing during the twenty-fifth year of a youthful offender's service of a 25-years-to-life term on a claim that the *Miller* factors had not been considered by the sentencing court. (See *In re Alatriste* (review granted Feb. 19, 2014, S214652) and *In re Bonilla* (review granted Feb. 19, 2014, S214960).) However, presumably all three appellate counsel in this case were also aware of these cases, and chose, at oral argument, not to broach the subject of the applicability of section 3051. Neither will we.

[19] Notably absent from the People's oral argument was any assertion that the language in *Gutierrez* is inapplicable to this case. Rather, the People relied on their waiver argument, an assertion that mandating the sentencing court's consideration of the *Miller* factors should be the result of a habeas petition, rather than this appeal, and an assertion that "all the facts" pertinent to Johnson's sentence were presented during the fitness hearing. As to the latter, we draw the People's attention to the remarks of Justice Liu in his concurrence in *Gutierrez*, *supra*, 58 Cal.4th at page 1394.

### c. *Correction of the Abstracts of Judgment*

Defendants correctly point out that their abstracts incorrectly state that the dates of the offenses were 2011, when they were 2009. We will direct the trial court to correct Windfield's and, when Johnson is resentenced, to correctly note the date in his abstract.

### d. *Pronouncement of Sentence on Johnson*

Because we are remanding Johnson's case for resentencing, as stated *infra*, we need not address his assertion that the trial court did not actually sentence him, although it clearly did.

Next, Johnson claims the sentencing court did not specify as to which enhancement it was imposing the 25-year-to-life term. The final charging document stated that the enhancement allegation that Johnson personally discharged a firearm causing death to the murder victim was brought pursuant to section 12022.53, subdivision (d) and the allegation that a principal personally discharged a firearm proximately causing death to the murder victim was brought pursuant to section 12022.53, subdivisions (d) and (e). The enhancement allegation that Johnson personally discharged a firearm causing great bodily injury to the attempted murder victim, after amendment[20] was brought pursuant to section 12022.53, subdivision (d) and the allegation that a principal personally discharged a firearm which proximately caused great bodily injury to the attempted murder victim, after amendment[21] was brought pursuant to section

---

[20] See pages 33 and 34, *ante*.

[21] See pages 34 and 34, *ante*.

47

12022.53, subdivisions (d) and (e). About two weeks after it had pronounced sentence, the court, without appearances from any of the parties, but apparently upon the request of someone, sought to, what it termed "address" matters not addressed due to "clerical error" and specified that it was imposing the 25-year- to-life enhancement under "12022.53(d)/e(1)" and "strik[ing] the separate . . . 12022.53(d) enhancement."

Johnson here contends that what the court did was not correct a clerical error, but declare something done which was not done. We disagree. Section 12022.53, subdivision (f) permits the imposition of only one enhancement under section 12022.53, subdivisions (d) or (e)(1) "for each crime." The court, when it originally imposed sentence, did exactly that. It just failed to state which of the two identical 25-year-to-life terms it was imposing. It did so less than two weeks later. Johnson has nothing about which to complain.

e. *Custody Credits for Johnson*

The parties agree that the sentencing court shorted Johnson by one day in its calculation of his presentence custody credits. When Johnson is resentenced, the court below should take note of this fact and award him an additional day.

## DISPOSITION

The convictions for both defendants and Windfield's sentence are affirmed, with the exception that the trial court is directed to strike from the jury's true findings any references to the defendants or principals personally using a firearm or personally and intentionally discharging a firearm. The trial court is directed to amend Windfield's

48

abstract of judgment to show that the crimes were committed in 2009, not 2011, as his abstract currently states and, upon resentencing Johnson, to correctly note in his abstract the date of commission of the crimes and the awarding of an additional day of presentence custody credits, the latter of which should also be reflected in the minutes of the court. Johnson's case is remanded for resentencing for consideration of the *Miller* factors, as set forth in *Gutierrez*, *supra*, 58 Cal.4th at pages 1388, 1389.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.


We concur:

MILLER
J.

CODRINGTON
J.