Filed 4/16/19 (unmodified opinion attached)

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OSCAR MEDINA et al.,<br><br>    Defendants and Respondents. | B286117<br><br>(L.A. Super. Ct. No. BA447145)<br><br><br><u>ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING</u> |

THE COURT*:

It is ordered that the opinion, filed herein on March 19, 2019, be modified as follows:

1. On page 20, heading No. 4 is changed by replacing "Attempted Murders" with "Charged Crimes" so that the heading reads:

There Was Substantial Evidence that Medina

Aided and Abetted the Charged Crimes

2.  On page 20, to the first sentence in subsection 4, add "assaults with a firearm" after "attempted murders so that sentence reads:

> Medina contends the evidence was insufficient that he aided and abetted the attempted murders and assaults with a firearm.

3.  One page 33, third sentence of the first full paragraph, the words "additional" and "eleven" are deleted.  The words "in addition to those at issue in this case" are inserted after "offense" and "a number" are inserted after "despite" so that the sentence reads:

> In the 14 years from his previous assaults with a firearm to the crimes at issue here, he was convicted of five offenses in addition to those at issue in this case despite a number of those years having been spent in prison.

4.  On page 38, first sentence of last paragraph, insert "s, to the first instance of the word "enhancement" so that the sentence reads:

> As for the remaining prior serious felony enhancements, at the time of sentencing the court had no discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667."

5.  On page 39, first sentence of first paragraph, add "s" to "conviction" so that the sentence reads:

> In a supplemental brief, Medina contends he is entitled to recalculation of his sentence after the statute's effective date so the court can exercise its discretion to strike the prior convictions.

2

6. On page 39, second sentence of first paragraph, insert "two remaining" after "Medina's" so that the sentence reads:

We agree, and direct the trial court to consider Medina's two remaining five-year enhancements on remand.

7. On page 40, second sentence of the disposition section, "two" is inserted before "remaining" and "s" is added to the word "enhancement" in the phrase "the remaining prior serious felony enhancement " so that the sentence reads:

On remand, the trial court shall recalculate Medina's sentence to strike one of the five-year prior serious felony enhancements, determine whether to strike the two remaining prior serious felony enhancements under section 667, subdivision (a)(1) and/or the 20-year firearm-use enhancement under section 12022.53, subdivision (c), and reduce the sentence accordingly if appropriate.

There is no change in the judgment.

Respondents' petitions for rehearing are denied.

_____

_____  _____  _____
*ROTHSCHILD, P. J.     CHANEY, J.        WEINGART, J.**

** Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/19/19 (unmodified opinion)
CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OSCAR MEDINA et al.,<br><br>    Defendants and Appellants. | B286117<br><br>(L.A. Super. Ct.<br> No. BA447145) |

APPEAL from judgments of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed in part; remanded with directions.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant Oscar Medina.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant Antonio Silva.

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II.B.2-3 and III.A.3 through and including III.F.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

## I.  INTRODUCTION

Defendants Antonio Silva and Oscar Medina, members of the Headhunters gang, were driving through the turf of a rival gang called Diamond Street.  They lost control of their car and crashed into an apartment building.  Bystanders gathered to look at the accident.  Unable to move the disabled vehicle, Silva and Medina left and returned in another car.  Silva got out of the car, pointed his gun, and started shooting at bystanders while Medina attempted to recover the crashed car.  The people on the street (including two individuals, Juan Alcaraz and Jose Sanchez, who lived in the apartment building) fled in terror.  None ended up being hit by the gunfire.  Medina was still unable to move the car, and Silva and Medina then left separately.  Silva left in the car in which he and Medina had returned to the accident scene.  Before Medina left on foot, he screamed his gang's name and a derogatory term for the Diamond Street gang.

A jury convicted Silva and Medina on four counts of attempted murder and four counts of assault with a firearm.  The jury also found true firearm-use and criminal street gang enhancements.  On appeal, defendants both contend insufficient evidence supports the convictions as well as the gang enhancements imposed against them, that certain jury instructions were improper, and that certain sentencing errors need correction.  Medina separately argues evidence of a previous

drive-by shooting in which he participated was erroneously admitted. Medina also raises numerous sentencing issues: He claims his *Romero*[1] motion was improperly denied, his prison sentence of 62 years to life constitutes cruel and/or unusual punishment, two five-year serious felony enhancements were improperly imposed, and that his case must be remanded pursuant to recently enacted Senate Bills Nos. 620 and 1393 for the trial court to consider whether to strike the firearm-use enhancement and his prior serious felony conviction for sentencing purposes.

In the published portion of this opinion, we hold it was error to instruct the jury on a "kill zone" theory under the facts of this case. In the unpublished portion, we explain why the error was harmless, affirm the convictions and the firearm-use and gang enhancement findings, and address Medina's claims of sentencing error.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Charges and Enhancement Allegations

Defendants were jointly charged in a consolidated second amended information with four counts of attempted murder (Pen. Code[2] §§ 187, subd. (a), 664, counts 1–4) and four counts of assault with a firearm (§ 245, subd. (a)(2), counts 5–8) of Juan Alcaraz, Jose Sanchez, John Doe One and John Doe Two. As to the attempted murder counts, the information specially alleged

---

[1]    *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

[2]    Statutory references are to the Penal Code unless otherwise designated.

6

that Silva and a principal had personally used and discharged a firearm.  (§ 12022.53, subds. (b), (c) & (e).)  As to the assault with a firearm counts, the information alleged Silva had personally used a firearm (§ 12022.5, subd. (a)).

The attempted murders and aggravated assaults were alleged to have been committed for the benefit of a criminal street gang (§ 186.22, subd. (b).)[3]  Finally, as to all counts, the information specially alleged Medina had suffered three prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i) and 1170.12) and section 667, subdivision (a)(1), and Silva had suffered one prior serious or violent felony conviction within the meaning of section 667, subdivision (a)(1) and had previously served two separate prison terms for felonies (§ 667.5, subd. (b)).

## B.    Summary of Trial Evidence

### 1.    *The Shooting*

In May 2016, Juan Alcaraz lived in an apartment building on Boylston Street in Los Angeles.  As the son of the building manager, Alcaraz had access to the live video feeds from the building's outside security cameras.

On the night of May 29, 2016, Alcaraz was inside the apartment building when he heard and felt something hit the

---

[3]    For simplicity, this opinion uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that according to the statute, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (§ 186.22, subd. (b); see *People v. Jones* (2009) 47 Cal.4th 566, 571, fn. 2.)

7

building. Alcaraz checked the security camera feed and saw a Chevy Cavalier had crashed into the building. Alcaraz went outside. He saw Silva run from the car and then return to try and help Medina, who was attempting to drive the car away.[4] When their efforts failed, defendants fled from the scene on foot.

Alcaraz's family and neighbors, including children, began coming outside. Minutes later, Alcaraz noticed a Scion automobile rapidly approaching the apartment building. Before the car came to a complete stop, the doors opened and defendants jumped out. Silva started shooting at Alcaraz and other bystanders—adults and children—who were directly in his line of fire. Alcaraz testified he was five to ten feet away and the other bystanders were 20 feet away from Silva at this point. Bystanders ran down the sidewalk away from Silva, funneled between the apartment building on one side and a row of parked cars on the other. Alcaraz heard six to eight gunshots before Silva stopped firing and left in the Scion.[5] The gunfire did not strike any onlookers or the apartment building.

Medina remained behind with the Chevy Cavalier, but was still unable to drive it. He began walking and screaming, "Headhunters gang, they own this turf" and "This is my neighborhood. This is Headhunters." Medina also yelled that he was not afraid and "F**k Diapers," which Alcaraz understood

---

[4] Police later discovered the car was owned by one of Medina's relatives.

[5] Six spent .380 caliber casings were recovered at the crime scene.

8

was a derogatory term for Diamond Street gang members. Medina then left on foot.

Jose Sanchez also lived in the apartment building on May 29, 2016. He and Alcaraz were the first two people to venture outside after the Chevrolet Cavalier crashed into the building. Sanchez saw the Scion speeding toward the apartment building. When the car was about 15 or 20 feet away, Sanchez heard a gunshot and ran to the recessed front porch of the apartment building. Adults and children were running and screaming. Sanchez heard four or five more gunshots in quick succession. When the shooting stopped, Sanchez heard a man say, "F**k Diamond, Headhunters."

Three video recordings from the building's security cameras were played for the jury during trial. Those recordings corroborated the eyewitness testimony described above.[6]

### 2. The Gang Evidence

Two weeks before the shooting, Medina told one of the officers that ended up arresting him that he belonged to the Headhunters gang and his moniker was Shadow.

Los Angeles Police Officer Mark Flores testified as a gang expert. According to Officer Flores, Medina and Silva were members of the Headhunters gang at the time of the shooting. Both men had numerous tattoos signifying their membership.

---

[6]    We requested the video recordings from the trial court and have reviewed them in preparing this opinion. The recordings, filmed from three different locations, show different aspects of the events leading up to and after the shooting, as well as the shooting itself, without sound.

Gang members commonly commit violent crimes together for mutual support and protection, and to hold each other accountable to the gang. Members of rival gangs, like the Headhunters and Diamond Street, frequently perpetrate violent crimes in each other's claimed territory such as drive-by shootings ending in murder. Their crimes are meant to intimidate their rivals, terrorize the community, and enhance their own gang's notoriety. Given a hypothetical set of facts based on the evidence in this case, Officer Flores opined a shooting in the stronghold of rival gang territory was typically carried out to benefit a criminal street gang.

### 3. *Medina's Prior Involvement in a Drive-By Shooting*

The prosecutor, over Medina's objection, introduced evidence that Medina had committed a 2003 drive-by shooting in Diamond Street territory. During that event, Medina fired a shotgun at some people standing outside a house, injuring one of them who knew Medina as "Shadow." The parties stipulated that Medina was convicted of assault with a firearm (§ 245, subd. (a)(2)) as a result of this 2003 shooting.

After an Evidence Code section 402 pretrial hearing, the trial court ruled the evidence was admissible to show intent and motive, and that its probative value was not outweighed by any prejudicial effect. Following the introduction of the evidence, the court admonished the jury it was to consider the evidence, if at all, "as to what [Medina's] intent was on the date in question in this case." The court gave a similar limiting instruction on the use of the evidence in the final charge to the jury. (See CALCRIM No. 375.)

10

Defendants neither testified nor introduced other evidence in their defense.

## C. The Verdicts and Sentencing

The jury convicted defendants as charged and found true the firearm-use and gang enhancement allegations. In a bifurcated proceeding, defendants each admitted the prior conviction allegations. Prior to sentencing, the trial court denied Medina's motion to dismiss his prior strike convictions (*Romero*, *supra*, 13 Cal.4th 497; § 1385). The court sentenced Silva to an aggregate term of 54 years to life in state prison, and Medina to an aggregate term of 62 years to life.

## III. DISCUSSION

## A. Challenges to the Sufficiency of the Evidence

### 1. *There Was Sufficient Evidence to Support the Convictions for Attempted Murder of Alcaraz and Sanchez*

Defendants first challenge the sufficiency of the evidence supporting the convictions for attempted murder of Alcaraz and Sanchez. In assessing this claim, we view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

A conviction for attempted murder requires proof that the defendant intended to kill the victim and a direct but ineffectual act toward accomplishing that goal. (*People v. Perez* (2010) 50 Cal.4th 222, 229 (*Perez*).) Defendants contend there was no substantial evidence of intent to kill because there was

11

insufficient evidence of where the gun was pointed when fired, there was no evidence regarding where the bullets landed or their trajectory vis à vis the bystanders on the street, and no one was injured.

"[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*People v. Stone* (2009) 46 Cal.4th 131, 140 (*Stone*).) Alcaraz testified that Silva pointed the gun at him and Sanchez (as well as others) when firing. The video evidence confirmed Alcaraz and Sanchez were down range and in the line of fire when Silva pulled the trigger. Alcaraz was five to ten feet away from Silva when Silva shot. Sanchez was 15 to 20 feet away.

Firing a gun at Alcaraz and Sanchez from such close range was substantial evidence from which the jury could find a specific intent to kill, and at least one direct but ineffective step towards killing them. (*People v. Smith* (2005) 37 Cal.4th 733, 742 ["[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice."] (*Smith*).) The fact that no one was injured does not negate an intent to kill. (*Ibid*. [fact that bullet missed its mark does not show lack of intent to kill]; *People v Chinchilla* (1997) 52 Cal.App.4th 683, 690 [fact that victim escaped death because of shooter's poor marksmanship does not necessarily establish a less culpable state of mind].)

### 2. Substantial Evidence Did Not Support Giving a Kill Zone Theory Instruction With Regard to the John Doe Attempted Murder Counts

"To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." (*People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*); see also *Smith, supra*, 37 Cal.4th at p. 739.) For purposes of an attempted murder charge, intent to kill does not transfer to nontargeted individuals. (*People v. McCloud* (2012) 211 Cal.App.4th 788, 797 (*McCloud*).) "Nonetheless, the kill zone theory, first approved by the Supreme Court in *Bland*, yields a way in which a defendant can be guilty of the attempted murder of victims who were not the defendant's 'primary target.'" (*Ibid*.) A conviction for attempted murder under a kill zone theory requires evidence that the defendant created a kill zone; that is, while targeting a specific person "the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located. . . .* [¶] In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant *specifically intends* that *everyone* in the kill zone die." (*Id.* at p. 798, italics in original.)

The jury was instructed, and the People argued, the kill zone theory only with regard to the John Doe attempted murder counts. With regard to the John Does, the jury was instructed the People had to prove the defendants intended to kill John Doe One and Two, or alternatively under the kill zone theory intended to kill Alcaraz and Sanchez by killing everyone in the

13

area in which Alcaraz and Sanchez were located (including Does One and Two).

"[I]t is error to instruct[ ] on a theory that is entirely unsupported by the evidence." (*People v. Burnett* (1992) 9 Cal.App.4th 685, 690.) Defendants contend the giving of a kill zone instruction was error because the evidence adduced at trial did not support it.[7] Defendants contend there were at least two evidentiary deficiencies that made a kill zone instruction inappropriate. First, defendants point out that a kill zone instruction requires evidence of an intent to kill a specific primary target, and argue such evidence was lacking here. Second, defendants contend that even if Alcaraz and Sanchez were primary targets, there was insufficient evidence the deaths of Alcaraz and Sanchez were to be achieved by killing everyone fleeing from the scene.

We agree giving the jury a kill zone instruction was error. The kill zone theory "is not a legal doctrine requiring special jury instructions" but rather "is simply a reasonable inference the jury

---

[7] Although defendants did not object to the kill zone instruction, and the People contend this issue has been forfeited on appeal, we review any claim of instructional error that allegedly affects the defendants' substantial rights even in the absence of an objection. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7.) We can only determine if defendants' substantial rights were affected by deciding whether the instruction was given in error and, if so, whether the error was prejudicial. Because we find in the unpublished portion of this opinion that the kill zone instruction did not affect the defendants' substantial rights, we also conclude defendants' claim of ineffective assistance of counsel to be without merit.

14

may draw in a given case." (*Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.)  The kill zone theory is one of concurrent intent—the defendant has the intent to kill a particular target, and the jury can infer from the method employed to attempt killing the primary target a concurrent intent to kill those around the primary target to ensure the primary target's death.  (*Id.* at p. 330.)  Without a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.

In addition to a primary target, there must be evidence of a specific intent to kill everyone in the kill zone surrounding the primary target–not some or most, but everyone.  (E.g., *Bland*, *supra*, 28 Cal.4th at p. 329 ["The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity."]; *Perez*, *supra*, 50 Cal.4th at p. 232; *People v. Cardona* (2016) 246 Cal.App.4th 608, 615; *McCloud*, *supra*, 211 Cal.App.4th at pp. 799−800; *People v. Vang*, (2001) 87 Cal.App.4th 554.)  Nor in a firearm case is the evidentiary defect with a kill zone instruction cured by reducing the number of attempted murder counts to no more than the number of shots fired, because regardless of the number of counts the defendant must intend to kill everyone in the kill zone, whether or not they are a charged victim.  (*People v. Cardona, supra*, 246 Cal.App.4th at pp. 614−615.)  We recognize that some fellow Courts of Appeal have held it sufficient to give a kill zone instruction if a defendant recognizes (or accepts the fact) that a natural and probable consequence of his or her act toward the primary target would be that anyone (as opposed to everyone) within the zone of

15

harm could or would die. (E.g., *People v. Windfield* (2016) 3 Cal.App.5th 739, 760−761, review granted January 11, 2017, S238073; *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023.) We respectfully disagree with this view, which we believe replaces the specific intent/express malice required for an attempted murder conviction with conscious disregard for life/implied malice, which *Bland* makes clear cannot support an attempted murder conviction. (*Bland*, *supra*, 28 Cal.4th at pp. 327−328.[8] The kill zone theory does not operate as an exception to the mental state requirement for attempted murder or as a means of bypassing that requirement. "Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland* at p. 331, fn. 6.)

A kill zone instruction is never required, and as numerous appellate cases attest, giving such an instruction can often lead to error. For example, a kill zone instruction is not appropriate where a defendant fires a deadly weapon into a group of

---

[8] Implied malice is " 'an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 107.) With regard to those in a zone of harm around the primary target, we perceive little difference between that implied malice standard and one in which the defendant acts towards a primary target " 'despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within [the kill] zone could or would die.' " (*People v. Windfield*, *supra*, 3 Cal.App.5th at p. 758; *People v. Adams*, *supra*, 169 Cal.App.4th at p. 1023.)

16

individuals with the intent to kill but without a primary target. Nor, in the absence of a primary target, is a kill zone instruction appropriate even if the defendant intends to kill everyone in that group. Where there is no primary target, there is no concurrent intent and no basis for a kill zone instruction. It is further important to understand that while a kill zone instruction would not be appropriate, a defendant could still be convicted of attempted murder under these circumstances. A jury can reasonably conclude a defendant without a primary target who repeatedly shoots into a crowd with the intent to kill committed multiple counts of attempted murder. (*Stone*, *supra*, 46 Cal.4th at pp. 138−140; *McCloud*, *supra*, 211 Cal.App.4th at pp. 798−799 ["the discussion in *Stone* makes clear that . . . a defendant can be convicted of several attempted murders if he intended to kill several people, even if there were not particular people he intended to kill"].)

We accordingly take this opportunity to reiterate that the kill zone instruction is not appropriate in the absence of evidence indicating the defendant had a primary target, and the specific intent to kill everyone in the kill zone around the primary target to ensure the target's death. The theory does not mean the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.

Viewing the evidence in the light most favorable to the judgment, there was no evidence the defendants here had a primary target. There was no preexisting relationship or prior

17

incident between the defendants and Alcaraz or Sanchez, or any other evidence suggesting the defendants specifically targeted those two individuals when they returned to the apartment building. Alcaraz did not identify himself as a primary target, and testified that Silva pointed the gun at "the public," "[l]ittle kids, family, Sanchez, me [Alcaraz], at random, anybody" when firing. Sanchez did not identify himself as a primary target—he heard gunshots, but did not see the gun or where it was pointed. The video showed Silva aimed and fired into the crowd, and did not suggest Alcarez or Sanchez was a primary target.[9] The evidence was therefore insufficient to support a kill zone theory, and it was error to give a kill zone instruction to the jury.

### 3. *The Error in Giving a Kill Zone Instruction Was Harmless*

#### (a) *Watson Review Applies*[10]

The question remains whether this error requires reversal of the two John Doe counts of attempted murder. To the extent the court erred in instructing on a theory unsupported by the evidence, the error is one of state law, "subject to the reasonable probability standard of harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [(*Watson*)]." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214; see also *People v. Debose* (2014) 59 Cal.4th 177, 205–206 [error of instructing on inapplicable theory subject to *Watson* review] (*Debose*).) On the other hand, "[i]nstructional error regarding the elements of the offense

---

[9] Even if there had been evidence of a primary target, the kill zone theory required an intent to kill *everyone* in the kill zone, not just John Doe One and Two, to achieve the death of the primary target. There was no evidence at trial of such an intent.

requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201; see *Chapman v. California* (1967) 386 U.S. 18, 24.)

Defendants argue the instructional error should be subject to the harmless beyond a reasonable doubt standard of *Chapman,* contending the CALCRIM No. 600 instruction given to the jury did not accurately explain the kill zone theory. The jury was instructed:

"A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone'. In order to convict the defendants of attempted murder of John Doe One or John Doe Two, the People must prove that the defendants not only intended to kill [Juan] Alcaraz or Jose Sanchez, but also either intended to kill John Doe One or John Doe Two or intended to kill everyone within the kill zone. If you have a reasonable doubt about whether the defendant intended to kill John Doe One or John Doe Two or intended to kill [Juan] Alcaraz or Jose Sanchez by killing everyone in the kill zone, then you must find the defendant not guilty of attempted murder of John Doe One or John Doe Two."

Defendants assert this instruction did not require the jury to find intent to kill, thereby allowing the attempted murder

---

**10** We note cases involving whether the jury was properly instructed on the kill zone theory are currently before the California Supreme Court in *People v. Canizales* (2014) 229 Cal.App.4th 820, review granted November 19, 2014, S221958; *People v. Cerda* (Jan. 23, 2015, B232572, B235674) [nonpub. opn], review granted April 22, 2015, S224430; and *People v. Sek* (2015) 235 Cal.App.4th 1388, review granted July 22, 2015, S226721.

convictions to be based solely on a finding of implied malice—in other words, that the jury could erroneously find intent if it concluded the reckless firing of a gun created the possibility bystanders would be harmed.

We review de novo whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) " 'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions as a whole, not in isolation.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 544.) The test is " 'whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of the trial and the arguments of counsel.' " (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370.)

As explained above, proof of express malice is required to establish attempted murder. That is, the defendant must have intended to cause the death of the victim or have known to a substantial certainty that death would occur. Implied malice or conscious disregard for human life will not suffice. (*Smith*, *supra*, 37 Cal.4th at p. 739; *Bland*, *supra*, 28 Cal.4th at pp. 327−328.)

Defendants fail to explain how the language of CALCRIM No. 600 created a reasonable likelihood the jury misconstrued or misapplied the law on the express malice requirement. The trial court instructed the jury on attempted murder, including the elements that the defendant took a direct step toward killing another person and "the defendant intended to kill that person." The court further instructed the jury that convicting a defendant of attempted murder of the John Does required finding an intent to kill the John Doe, or an intent to kill everyone within the kill zone. The People argued in closing that defendants intended to

20

kill Alcaraz, Sanchez, John Doe One and John Doe Two. The defense argued lack of intent, and highlighted that recklessness was not enough to demonstrate intent. Considering the instructions given, the entire record of the trial, and the arguments of counsel, we do not find any reasonable likelihood the jury misconstrued or misapplied the law on express malice.

Defendants additionally fault CALCRIM No. 600 for its single reference to "zone of harm" rather than "zone of lethal harm." They assert the failure to include the word "lethal" invited the jury to infer the intent to kill John Does One and Two solely from their presence in a zone of "nonlethal harm." In *People v. Bragg* (2008) 161 Cal.App.4th 1385 the court addressed the adequacy of "zone of harm" to express the idea of a kill zone. The court concluded, "[n]o reasonable juror could have failed to understand from the instructions as a whole that, to the extent the court occasionally used . . . the phrase 'zone of harm,' the harm to which the court referred was the ultimate harm of death and that the law required that defendant had to have intended to kill the victims. Given the totality of the instructions, there was no error." (*Id.* at p. 1396.) Similar reasoning applies here. There was no instructional error requiring that we apply *Chapman* review, and we instead assess pursuant to *Watson* whether it is reasonably probable the jury would have reached a result more favorable to defendants had the kill zone instruction not been given. (*Debose, supra,* 59 Cal.4th at pp. 205–206.)

21

> **(b)** *It Was Not Reasonably Probable the Jury Would Have Reached a Result More Favorable to Defendants Had the Kill Zone Instruction Not Been Given*

The People did not rely exclusively on the kill zone theory when arguing the John Doe attempted murder counts. As discussed above, the People argued in closing that defendants intended to kill John Does One and Two, and alternatively that defendants intended to kill Alcaraz and Sanchez by killing everyone within the kill zone (including the Does).

Silva pointed the gun directly at individuals other than Alcaraz and Sanchez while firing. Regardless of whether anyone was hit, firing six to eight gunshots at Alcaraz, Silva and the Does from five to 20 feet away was substantial evidence of a specific intent to kill the two Does, and a direct but ineffectual act toward accomplishing that goal. (*Smith, supra*, 37 Cal.4th at p. 742.) In light of the lethal capability of the weapon used, the number of shots fired, the proximity and direction of the gunfire, the vulnerability of the victims, and the People's nonkill zone argument for guilt, the error in giving the kill zone instruction was harmless. In evaluating what the jury is likely to have done in the absence of the kill zone instruction, we "may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) Here, it is not reasonably probable the jury would have reached a result more favorable to defendants in the absence of kill zone instruction, as

22

uncontradicted testimony of Alcaraz, Sanchez and the video recordings was relatively strong evidence of specific intent to kill the Does, and any evidence supporting a different outcome was relatively weak.

### 4. *There Was Substantial Evidence that Medina Aided and Abetted the Attempted Murders*

Medina contends the evidence was insufficient that he aided and abetted the attempted murders. "A 'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Marshall* (1997) 15 Cal.4th 1, 40.) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.) "Whether a person aided and abetted in the commission of a crime ordinarily is a question of fact." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.)

Medina maintains he was merely present at the shooting and cites *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262 as supporting his contention that he did not aid and abet Silva.[11]  In

---

[11]  Although we may find lower federal court decisions concerning state law issues persuasive, they do not control. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 296.)

23

that case, the court found insufficient evidence to support the defendant's conviction as an aider and abettor to a murder and an attempted murder based on his presence during the crimes. (*Id*. at p. 1277.) The defendant, a juvenile, was standing beside his brother when his brother shot and killed one person and shot at another. Rather than flee with his brother after the shooting, the defendant went home. (*Id*. at pp. 1266–1267.) There was no evidence the defendant knew of his brother's intent or acted in any way to encourage or facilitate the crimes. The Ninth Circuit held that, even assuming the element of knowledge, there was no evidence the defendant did or said anything before, during or after the shooting from which a reasonable fact finder could infer an intent to aid and abet the crimes. (*Id*. at pp. 1278–1279.)

A defendant's mere presence at a crime scene does not amount to aiding and abetting. (*People v. Joinder* (2000) 84 Cal.App.4th 946, 967; *People v. Hill* (1946) 77 Cal.App.2d 287, 293–294.) However, unlike *Juan H.'s*, Medina's convictions are based on more than mere presence. (See *In re Juan G.* (2003) 112 Cal.App.4th 1, 5 [The factors relative to determining aiding and abetting are presence at the crime scene, companionship and conduct before and after the offense, including flight.].) Defendants were fellow gang members who entered rival gang territory together. They fled together following the car crash. They returned together minutes later in the Scion with front and back passenger doors open. They simultaneously jumped out of the car. Medina stood briefly behind Silva, who began shooting at the bystanders while Medina attempted to recover the Cavalier. Silva reentered the Scion, leaving the front passenger door open for Medina. After Silva drove away, Medina shouted gang-related insults for the neighborhood to hear. From this

24

evidence a jury could reasonably infer the shooting was planned, and that Medina was not simply an onlooker but shared Silva's intent to kill, and coordinated his actions with Silva to encourage and facilitate a gang-related shooting.

While gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime, a gang expert's testimony can serve to "strengthen[ ] inferences arising from other evidence specific to the defendant's role in the crime at issue." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) Here, Officer Flores's testimony that the Headhunters and Diamond Street gangs are longstanding rivals, and that gang members typically commit violent crimes together for protection and support in rival gang territory, further supported the inference that Medina intended, encouraged and facilitated the shooting.

### 5. *The Gang Enhancements*

Defendants' claim that the evidence was insufficient to support the gang enhancements imposed against them is meritless. The location of the shooting in rival gang territory, the coordinated involvement of two Headhunters gang members (one of whom was involved in a prior drive-by shooting in Diamond Street territory), Medina's behavior in shouting gang insults after the shooting, and the gang expert's opinion constituted ample evidence that the attempted murders and aggravated assaults were committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of section 186.22, subdivision (b)(1). (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931 [substantial evidence supported gang enhancement when expert

25

opinion was coupled with other testimony from which jury reasonably could infer crime was gang related].)

## B. The Unanimity Instruction Given to the Jury Does Not Require Reversal

Following closing arguments but prior to deliberations, the trial court sua sponte gave the jury an instruction based on CALCRIM No. 3500:

"[The] defendants are charged with attempted murder of John Doe One and John Doe Two in counts 3 and 4 respectively.

"The People have presented evidence of more than one act to prove the defendant committed these offenses.

"You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts or counts and you agree on which act he committed for each of those counts." (CALCRIM No. 3500.) The court stated that it gave the instruction because the People argued the kill zone theory as an alternative means of proving the John Doe attempted murder counts, and it wanted to make sure the jurors unanimously agreed there was an intent to kill a specific John Doe One and John Doe Two, or an intent to kill everyone in the kill zone. The court gave the same unanimity instruction for the assault with a firearm charges against John Doe One and John Doe Two in counts 7 and 8, respectively.

Defendants contend the trial court erred in failing to give a more pinpoint unanimity instruction regarding the identity of John Doe One and John Doe Two for each of the attempted murder and assault with a firearm counts. Defendants did not request such a pinpoint instruction, and that failure forfeits their

claim of error on appeal. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001; accord, *People v. Rogers* (2006) 39 Cal.4th 826, 878–879 [no sua sponte duty to give pinpoint instruction].)[12]

Nor do we agree that the alleged instructional error affected the defendants' substantial rights. (§ 1259.) Giving the CALCRIM No. 3500 unanimity instruction in this case was error, but not for the reasons defendants assert. That form instruction is typically appropriate when the evidence suggests more than one discrete crime, the prosecution has not elected among those crimes, and jurors must therefore agree on the specific crime committed. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) For example, in *People v. McNeill* (1980) 112 Cal.App.3d 330 upon which defendants rely, the defendant fired a series of rapid gunshots at four people. (*Id.* at p. 334.) The defendant was convicted on an information that alleged a single count of assault with a deadly weapon that named all four individuals as victims. (*Ibid.*) On appeal, the conviction was reversed because no unanimity instruction was given, and the Court of Appeal could not determine whether the jurors agreed unanimously upon which act constituted the charged offense. (*Id.* at p. 336.)

The pleading defect at issue in *McNeil* was not present here. The information alleged four separate counts of attempted murder and four separate counts of assault with a firearm, each against a single named victim. A unanimity instruction

---

[12]    Defendants contend they did not have the opportunity to object because the trial court read the instruction before discussing it with counsel. However, outside the presence of the jury the court explained why it gave the instruction and gave counsel an opportunity to comment.

requiring agreement on the specific act committed by the defendant was not required here given that each crime and each victim was separately charged, and the shots directed at those victims were fired within seconds of each other. (E.g., *People v. Bui* (2011) 192 Cal.App.4th 1002, 1010−1011 [gunshots fired within seconds of each other formed one continuous course of conduct, such that prosecutor was not required to elect which shot she relied on for attempted murder charge, and trial court was not required to give a unanimity instruction].)[13] It was therefore error to instruct the jury on a legal theory that, although technically correct, had no application to the instant case. (See *People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) That being said, the instruction as given held the People to an even greater degree of proof than necessary by requiring unanimity on which particular fired bullet supported the attempted murder and assault counts. Accordingly, any error was harmless. (*Guiton*, at p. 1130 [no reversible error where no reasonable probability jury misled to defendant's detriment].)

Nor do we find that the unanimity instruction as given, or the lack of a more pinpoint instruction, allowed the jury to convict defendants without agreeing on the identity of the Doe

---

[13] Nor was a unanimity instruction required (as the trial court believed) because of the kill zone instruction, as the kill zone theory is not a separate distinct crime or a legal doctrine requiring special jury instructions, but rather "simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.)

victims.  Silva's counsel argued the jurors needed to agree on the identity of the Does, and suggested the People had not carried their burden because "they want you to pick and choose whichever one that [they] think[ ] might actually work, basically, just throwing it in the air and relying on you to do the hard work for [them]. . . .  You don't have enough information to decide one way or the other [who the Does are]."  The People did not dispute the jurors needed to agree on this issue, responding in rebuttal "you [the jury] can decide who is John Doe 1 [and] 2."  The trial court fully and properly instructed the jury on the elements of attempted murder, assault with a firearm and aiding and abetting liability, which included, where applicable, the element of specific intent directed at the named victim.  The trial court further instructed the jury based on CALCRIM No. 200 that the inclusion of a particular instruction does not mean that the court was "suggesting anything about the facts," and that the jury should first decide what the facts were and then "follow the instructions that do apply to [those] facts."

We presume the jury followed these instructions and ignored any inapplicable instructions.  (*People v. Holloway* (2004) 33 Cal.4th 96, 152-153.)  We also credit that jurors will interpret the instructions with intelligence and common sense.  (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1131.)  Because the unanimity instruction did not keep the jury from evaluating the defendants' defense that they lacked the requisite intent to kill specific individuals, "we are confident the jury was not sidetracked by the correct but irrelevant instruction, which did not figure in the closing arguments, and we conclude that the giving of the instruction was harmless error." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381−1382.)

29

## C.  Admissibility of Medina's 2003 Drive-By Shooting

Medina claims the trial court erred in admitting evidence regarding his participation in a 2003 shooting.  The trial court's ruling on the admissibility of such evidence under Evidence Code sections 1101 and 352 is reviewed for abuse of discretion.  (*People v. Cage* (2015) 62 Cal.4th 256, 273–274.)

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, (*Ewoldt*).)  Subdivision (b) of the section provides, however, this rule "does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, at p. 393*;* see Evid. Code, § 1101, subd. (b).)

The admissibility of evidence under Evidence Code section 1101, subdivision (b) depends on the degree of similarity between the uncharged act and the charged offense.  (*Ewoldt, supra,* 7 Cal.4th at p. 402.)  For evidence of an uncharged act to be admissible to prove motive, intent, identity, or common design or plan, the uncharged act and charged offense must be "sufficiently similar to support a rational inference" of these material facts. (*People v. Kipp* (1998) 18 Cal.4th 349, 369 (*Kipp*).)  "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt, supra*, 7 Cal.4th at p. 402.)  To be admissible to prove intent, the uncharged misconduct need only be sufficiently similar to the charged offense to support the inference that the defendant

30

probably harbored the same or similar intent in each instance. (*Ibid.*) Similarly, " '[t]he existence of a motive requires a nexus between the [uncharged] crime and the [charged] one, but such linkage is not dependent on comparison and weighing of the similar and dissimilar characteristics of the past and present crimes.' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1115.)

Finally, the probative value of the evidence of the uncharged crime "must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Kipp, supra,* 18 Cal.4th at p. 371, accord, *People v. Carter* (2005) 36 Cal.4th 1114, 1149; Evid. Code, § 352)

### 1.   *Evidence of the 2003 Drive-By Shooting Was Admissible to Prove Intent and Motive*

Medina contends evidence of the 2003 drive-by shooting was too remote and too dissimilar to be relevant to his intent and motive during the instant offenses. He argues that unlike the 2003 shooting, on this occasion Medina was not alone and did not fire a gun. Instead, he crashed his relative's car and was solely focused on trying to drive it away.

As the trial court recognized in admitting the evidence, Medina's intent at the time of the instant offense was the critical issue in the case. The prosecution's theory was that although not the shooter, Medina aided and abetted the attempted murders. Medina's theory was that he was just trying to retrieve his relative's car and had no criminal intent. Evidence of an earlier unprovoked drive-by shooting of bystanders outside a residence in rival gang territory was offered to contradict Medina's position, and to help argue that he harbored the intent to kill bystanders

31

in rival gang territory. While not identical, the offenses were sufficiently similar to meet the standard required by Evidence Code section 1101, subdivision (b). (See *Ewoldt, supra*, 7 Cal.4th at p. 403; *Kipp, supra*, 18 Cal.4th at p. 371.)

Evidence of the previous drive-by shooting was also probative of the People's theory regarding Medina's motive in committing the instant offenses—to benefit a criminal street gang. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 655 [" '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent" ' "]; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212 [evidence the defendant took part in prior gang-related drive-by shooting was relevant to prove defendant's motive in current drive-by shooting was gang related]; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 [evidence of prior gang activity was relevant to the defendant's motive for murdering victim].)

### 2. The Trial Court Did Not Abuse Its Discretion in Determining Evidence of the 2003 Drive-By Shooting Was Not Substantially More Prejudicial than Probative

The trial court's determination that evidence regarding the 2003 incident was not sufficiently remote, and not more prejudicial than probative, was within its discretion. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1195; *People v. Whisenhunt, supra*, 44 Cal.4th at p. 205 [prior uncharged violent act between seven and 10 years earlier was admissible to show intent; "we cannot conclude that the passage of time significantly lessened the probative value of the evidence"].) Additionally, the fact the

earlier shooting resulted in a conviction meant the jury in this case was less inclined to consider whether Medina was guilty of the uncharged offense and whether he should be punished for it. (See *People v. Tran* (2011) 51 Cal.4th 1040, 1047.)

## D.    Cumulative Errors

Defendants contend that a combination of errors rendered their trial fundamentally unfair, requiring reversal.  The few errors that occurred during trial were harmless, whether considered individually or collectively.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [stating general rule].)  Defendants were entitled to a fair trial, but not a perfect one.  (*United States v. Hasting* (1983) 461 U.S. 499, 508−509 [the Constitution does not guarantee an error-free, perfect trial]; *People v. Anzalone* (2013) 56 Cal.4th 545, 556.)

## E.    Medina's Claims of Sentencing Error

### 1.    *Motion to Dismiss Prior Strike Convictions*

Medina had three prior strike convictions:  two for assault with a firearm in 2004 and one for making a criminal threat in 2011.  At a posttrial hearing, Medina moved to dismiss all three prior strike convictions.  In denying the motion, the court explained, "I think the facts in this case don't warrant it.  The record—the continuing nature of picking up convictions on behalf of Mr. Medina, I don't think he's someone who falls out of the spirit of the three strikes law.  So the 1385 motion, *Romero* motion to strike priors, is denied."  Medina appeals this ruling, which we review under the abuse of discretion standard.  (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377 (*Carmony*).)

33

Trial courts have limited discretion under section 1385 to dismiss prior convictions in three strikes cases. (*Romero, supra*, 13 Cal.4th at p. 530; see *People v. Williams* (1998) 17 Cal.4th 148, 162.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*Carmony, supra,* 33 Cal.4th at pp. 376−377.) "[W]hen a defendant's criminal conduct has been proven to be immune from ordinary modes of punishment, one of the duties of the judiciary is to protect the public by utilizing recidivist sentencing statutes to incarcerate such persons." (*People v. Castello* (1998) 65 Cal.App.4th 1242, 1250−1251.) Thus, when sentencing pursuant to the three strikes law, objectives include protection of public safety and punishment of recidivism. (*Id.* at p. 1251.)

"Second, ' "a decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*Carmony, supra*, 33 Cal.4th at p. 377.) Generally, an abuse of discretion occurs only when "the trial court was not 'aware of its discretion' to dismiss" a prior strike conviction, considered impermissible factors, or the defendant clearly falls outside the spirit of the three strikes law. (*Id.* at p. 378.)

In deciding whether to dismiss a prior strike conviction the trial court "must consider whether, in light of the nature and

34

circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams, supra,* 17 Cal.4th at p. 161.) We presume the trial court considered all "relevant factors in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

According to the probation officer's report, Medina's criminal history consisted of his two convictions for assault with a firearm and one conviction for possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)) in 2004 for which Medina was sentenced to state prison; a conviction for misdemeanor hit and run (Veh. Code, § 20002, subd. (a)) in 2007; and a conviction for making a criminal threat (§ 422) in 2011 for which he was again sentenced to state prison.[14] Medina, a documented gang member, was on parole at the time of the instant offenses.

Medina contends the trial court abused its discretion by failing to dismiss two of his three prior strike convictions as an alternative to dismissing all of them. Medina maintains that

___

[14] We are aware that when multiple offenses are committed as part of a single act, at the same time during the same course of criminal conduct against the same victim, only one of them is to be considered as a prior strike conviction. (*People v. Vargas* (2014) 59 Cal.4th 635, 646−649.) Medina does not argue, and the record does not reflect, that his two 2004 assault with a firearm convictions fall under *Vargas* such that they should be considered only one strike.

35

being sentenced as a second-strike offender would have been sufficient punishment based on him being 16 years old when he committed the prior assaults with a firearm, not being the shooter in this case, and the fact no one was injured. He further speculates, without any support in the record, that his criminal threat conviction may not have been that serious.

This is not the "extraordinary case" which "the relevant factors . . . manifestly support the striking of a prior conviction and no reasonable minds could differ." (*Carmony, supra*, 33 Cal.4th at p. 378.) While Medina's record was not necessarily extensive, a reasonable factfinder could conclude he was a violent recidivist offender and danger to the community. In the 14 years from his previous assaults with a firearm to the crimes at issue here, he was convicted of five additional offenses despite eleven of those years having been spent in prison. Three of his prior felony convictions were characterized by violence, at least one of which was gang-related. He was on parole when he committed the attempted murders and assaults with a firearm. The trial court did not abuse its discretion in declining to strike the prior convictions.

Medina finally asserts his trial counsel was ineffective for failing to urge the alternative of dismissing one prior strike conviction, and sentencing Medina as a second-strike offender. Section 1385 grants a trial court the discretion to dismiss a prior strike conviction on its own motion, without request of trial counsel or motion by the prosecutor. Given this authority, Medina's claim of ineffective assistance of counsel would prevail only if he shows: (1) the trial court was unaware of its discretion to dismiss one or more prior strike convictions; (2) the court was aware of its discretion under section 1385, but abused it in

36

declining to dismiss the convictions, and (3) Medina suffered resulting prejudice because he fell outside the spirit of the three strikes law.  (See *Strickland v. Washington* (1984) 466 U.S. 668, 694.)  The trial court was fully aware of its discretion to dismiss the prior strike convictions and did not abuse its discretion by declining to do so.  Medina therefore cannot demonstrate the prejudice required for a successful claim of ineffective assistance of counsel.

### 2.    *Cruel and/or Unusual Punishment*

As a third strike offender, Medina was sentenced to an aggregate state prison term of 62 years to life.  That sentence consists of concurrent indeterminate life terms with minimum terms of 27 years (three times the upper nine-year term) for each of the four attempted murders, plus 20 years for the firearm-use enhancement, plus 15 years for the two serious felony enhancements.[15]  Medina contends this sentence was unconstitutionally excessive under the Eighth Amendment of the United States Constitution (proscribing "cruel and unusual punishments") and article 1, section 17 of the California Constitution (prohibiting "[c]ruel or unusual punishment").

Because Medina failed to raise this issue in the trial court, he has forfeited his claim.  (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247 ["A claim a sentence is cruel and unusual is forfeited on appeal if it is not raised in the trial court, because the issue often requires a fact-bound inquiry"].)  In any event, the claim lacks merit.

---

[15]    Sentencing errors with respect to the four convictions for assault with a firearm are discussed below.

37

To the extent Medina argues his sentence is categorically impermissible as a de facto life without parole sentence given his age and personal characteristics, he is incorrect. While a de facto life without parole sentence for a juvenile convicted of a nonhomicide offense violates the Eighth Amendment (*People v. Caballero* (2012) 55 Cal.4th 262, 265), that rule does not apply here because Medina was a 30-year-old adult. (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.)

Nor is Medina's sentence grossly disproportionate under federal and state constitutional principles. " '[T]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. [Citations.]' [Citation.] Successful grossly disproportionate challenges are ' "exceedingly rare" ' and appear only in an ' "extreme" ' cases." (*People v. Em* (2009) 171 Cal.App.4th 964, 977.) Under our state constitutional cruel and unusual punishment provision, we use "a three-pronged test to determine whether a particular sentence is disproportionate to the offense for which it is imposed. First, we examine 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.] Second, we compare the punishment imposed with punishments prescribed by California law for more serious offenses. [Citation.] Third, we compare the punishment imposed with punishments prescribed by other jurisdictions for the same offense. [Citation.] Defendant must overcome a 'considerable burden' to show the sentence is disproportionate to his level of culpability. [Citation.] Therefore, '[f]indings of disproportionality have occurred with exquisite rarity in the case law.' " (*Id.* at p. 972.)

Considered under these principles, Medina's sentence was not grossly disproportionate. For example, a sentence of 40 years to life for multiple convictions, including attempted murder with a firearm, was held not to be excessive even as to a defendant with no prior convictions. (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1230.) Medina's arguments about the nature of the offense and offender do not carry Medina's considerable burden to show disproportionality. Medina was a recidivist offender of crimes of violence who committed attempted murder for gang-related reasons while on parole.

Nor is Medina's comparative analysis convincing. The significant part of Medina's nonstrike-related sentence can be attributed to a 20-year section 12022.53 firearm-use enhancement, and thus Medina's comparison of his sentence to ones not subject to section 12022.53 is inapposite. "[T]he Legislature determined in enacting section 12022.53 that the use of firearms in commission of the designated felonies is such a danger that, 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.' The ease with which a victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives." (*People v Martinez* (1999) 76 Cal.App.4th 489, 497−498.) Here, the intentional use of a firearm could easily have caused death or injury. That neither result occurred in this case does not obviate the need to distinguish between violent crimes committed by use of a firearm and those committed by other means. (*People v.*

*Villegas, supra,* 92 Cal.App.4th at p. 1231.)  Medina's sentence was not unconstitutionally excessive.

### 3.    *Firearm-Use Enhancement*

When the trial court sentenced Medina on October 31, 2017, it was required to apply the 20-year firearm-use enhancement under section 12022.53, subdivision (c).  Effective January 1, 2018, the statute now affords a court discretion to strike or dismiss the gun discharge/use enhancement.  (Stats. 2017, ch. 682, § 2.)  The statute applies retroactively to Medina because his conviction was not final as of the effective day of the amendment, and he may benefit from the potential reduced sentence.  (See *People v. Robbins* (2018) 19 Cal.App.5th 660, 678.)

Medina contends he is entitled to recalculation of his sentence after the statute's effective date so the trial court can exercise its discretion to strike the firearm-use enhancement.  We agree and direct the trial court to consider Medina's 20-year enhancement on remand to determine if Medina's sentence should be recalculated.  We disagree with the People's view that remand for this purpose is unnecessary because the record indicates the court would not have exercised its discretion to strike the enhancement in any event.  (See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

In response to an inquiry by trial counsel for Silva (not Medina) about continuing Silva's sentencing hearing so the court could consider exercising its discretion under the soon to be amended section 12022.53, subdivision (c), the court declined, saying it would not exercise its discretion in any event.  As neither the request nor the court's response included Medina, we

40

conclude remand is appropriate. We express no opinion as to how the court should exercise its newfound discretion.

### 4. *Prior Serious Felony Enhancements*

In sentencing Medina, the trial court imposed two prior serious felony enhancements under section 667, subdivision (a)(1)[16] based on two prior convictions in the same case (L.A. Super. Ct. case No. BA255819.) Medina asserts, the People acknowledge, and we agree the trial court erred in imposing more than one five-year enhancement for prior serious felonies not "brought and tried separately." We direct the trial court on remand to strike one of the two prior serious felony convictions in case No. BA255819.

As for the remaining prior serious felony enhancement, at the time of sentencing the court had no discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (Former § 1385, subd. (b).) On September 30, 2018, the Governor signed Senate Bill No. 1393 which, effective January 1, 2019, amends sections 667, subdivision (a) and 1385, subdivision (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony

---

[16] Section 667, subdivision (a)(1) provides in relevant part that "[a]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state or of any offense committed in another jurisdiction which includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively."

conviction for sentencing purposes.  (Stats. 2018, ch. 1013, §§ 1–2.)

In a supplemental brief, Medina contends he is entitled to recalculation of his sentence after the statute's effective date so the court can exercise its discretion to strike the prior conviction. We agree, and direct the trial court to consider Medina's five-year enhancement on remand.  (See *People v. Garcia* (2018) 28 Cal.App.5th 961, 971–974.)  Again, we express no opinion as to how the court should exercise its discretion on remand.

## F.  Errors in the Abstract of Judgment

Both defendants contend, the People acknowledge, and we agree the trial court imposed an unauthorized sentence by failing to stay sentencing on the four counts of assault with a firearm under section 654.  The court ordered counts 5 through 8 "merged" and the abstract of judgment reflects that concurrent sentences were imposed on those counts.  The counts, however, do not merge nor is a concurrent sentence correct; the sentences on counts 5 through 8 should have been stayed.  (*People v. Mesa* (2012) 54 Cal.4th 191, 195.)

## IV.  DISPOSITION

The judgments of conviction and firearm-use and gang enhancement findings are affirmed.  On remand, the trial court shall recalculate Medina's sentence to strike one of the five-year prior serious felony enhancements, determine whether to strike the remaining prior serious felony enhancement under section 667, subdivision (a)(1) and/or the 20-year firearm-use enhancement under section 12022.53, subdivision (c), and reduce the sentence accordingly if appropriate.  As to both defendants, the court shall stay the sentences on counts 5 through 8 for assault with a firearm under section 654.  The court is directed to prepare new abstracts of judgment for both defendants, and forward the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PARTIAL PUBLICATION


WEINGART, J.*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43